**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

|  |  |
|---|---|
| CYNTHIA SPOON, SOPHIA COOK-PHILLIPS, and ERIC MOLL,<br><br>Plaintiffs,<br><br>v.<br><br>BAYOU BRIDGE PIPELINE LLC, et al.,<br><br>Defendants. | Case No. 3:19-cv-00516-SDD-EWD |

**PLAINTIFFS' CORRECTED MEMORANDUM IN OPPOSITION TO**
**DEFENDANT BAYOU BRIDGE PIPELINE, LLC'S**
**MOTION FOR SUMMARY JUDGMENT**

## I.  INTRODUCTION

To silence protesters of their pipeline construction site, Bayou Bridge Pipeline, LLC ("BBP") funded, initiated, and directed the use of felony arrests of protesters in contemplation of the August 1, 2018 effective date of the amendments to La. R.S. § 14:61 (Act 692 of the 2018 Legislature) which made Unauthorized Entry on Critical Infrastructure a felony instead of a misdemeanor.

After the arrests of Plaintiffs Cynthia Spoon, Sophia Cook-Phillips, and Eric Moll on August 9, 2018—the first arrests under the amended § 14:61—Russell Sweeney, the senior BBP executive in charge of providing security for the pipeline's construction, celebrated the effectiveness of the plan:

The LA felony infraction of Unauthorized Entry of Critical Infrastructure in violation of Louisiana Revised Statutes (LRS) 14:62 [*sic*] is helping us reduce the potential for ROW[1] incursions by protestors. **Since the last three protestors were arrested a few weeks ago and charged under this law, we've had no further ROW issues associated with protestors**. This coupled with an active St Martin's Parish Sheriffs' office has sent a clear message that serious rules will be enforced.

Additionally, **the social media post below from a would-be activist indicates this person's reluctance to come to LA and protest is a direct result of the law**. Lastly, we've seen recent social media posts from several of our recent arrestees on BBP, who have moved on and are now in camps in Michigan protesting Enbridge's' [*sic*] Line 3 project. **All good news for us!**[2]

In trumpeting the "reluctance to come to Louisiana and protest," Sweeney unmasked the true purpose of the Plaintiffs' arrests. In the face of this lawsuit, BBP has changed its tune, and now contends that it was hands-off with respect to any response to pipeline protests, leaving them to the discretion of the law enforcement officers hired by a subcontractor, Defendant HUB Enterprises, Inc. ("HUB"). For good measure, BBP also asserts that the arrests were supported by probable cause – though notably, BBP does not defend the arrests under the "serious rules" established by the 2018 amendments to the Unauthorized Entry of Critical Infrastructure statute.

As discussed at length below, BBP can certainly attempt those arguments before a jury at trial. In the current procedural context, genuine issues of material fact preclude summary judgment in BBP's favor.

---

[1] "ROW" in this context refers to "right-of-way."

[2] Ex. 1 (Dep'n Ex. 152) (emphasis added).

## II.  STATEMENT OF FACTS

Plaintiffs direct the Court to their separate Statement of Contested Material Facts, which opens with a lengthy discussion of the facts relevant to BBP's motion for summary judgment.

## III.    STANDARD OF REVIEW

Summary judgment is only appropriate when the moving party shows that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if a "a reasonable jury could return a verdict for the nonmoving party."[3] The movant must "identify those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits," that demonstrate that there is no genuine issue of material fact.[4] Importantly, "[a]ll reasonable factual inferences are drawn in favor of the nonmoving party."[5] The nonmoving party's burden "is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence."[6] Additionally, the court may not "evaluate the credibility of witnesses, weigh the evidence, or resolve material factual disputes" at the summary judgment stage.[7]

---

[3] Evans v. E. Baton Rouge Par. Sch. Bd., No. CV 19-542-SDD-RLB, 2022 WL 698062 (M.D. La. Mar. 8, 2022), quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

[4] Papillion v. Louisiana Dept of Pub. Safety & Corr., No. CV 19-117-SDD-SDJ, 2022 WL 907140, at *1 (M.D. La. Mar. 28, 2022).

[5] McCrea v. Rapid Logistics, LLC, No. CV 20-601-SDD-EWD, 2022 WL 3093745, at *2 (M.D. La. Aug. 3, 2022), citing Galindo v. Precision American Corp., 754 F.2d 1212, 1216 (5th Cir. 1985).

[6] Desselle v. Louisiana Dep't of Transportation, No. CV 19-565-SDD-RLB, 2021 WL 2425987, at *4 (M.D. La. June 14, 2021), quoting Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994).

[7] International Shortstop, Inc. v. Rally's, Inc., 939 F.2d 1257, 1263 (5th Cir. 1991).

Documents produced by a party are considered authenticated for purposes of the opposition to summary judgment.[8] This is significant in the present context, because BBP's witnesses often could not remember documents, meetings, and communications which were memorialized in many of the materials produced by BBP and other parties.

## IV. LAW AND ARGUMENT

### A. Genuine issues of material fact regarding BBP's responsibility for the arrests preclude summary judgment.

BBP takes the simplistic approach that, because none of the Defendants involved in the Plaintiffs' arrests were directly on BBP's payroll, it cannot be liable for their actions on August 9, 2018. But BBP's own course of conduct, and that of other parties under BBP's control, preclude summary judgment.

#### 1. There is a sufficient nexus between BBP and the state actors who arrested Plaintiffs.

##### a. Private parties are liable under § 1983 if there is a sufficiently close nexus between the State and the challenged action and if the private actor willingly participated or conspired in the action.

Plaintiffs assert § 1983 liability against BBP in Counts I (False Detention, Arrest, and Imprisonment in Violation of the Fourth and Fourteenth Amendments) and III (Retaliatory Arrest for Violation of First Amendment Rights). Supreme Court and Fifth Circuit jurisprudence establishes when a private entity such as BBP can be liable for the violation of constitutional rights under color of law. As the Fifth Circuit has explained, "the focus of the inquiry into whether a private actor can be subjected to constitutional liability is whether such a close nexus between the

---

[8] Snyder v. Whittaker Corp., 839 F.2d 1085, 1089 (5th Cir. 1988); Heck v. Buhler, Civ. No. 07-21-C, 2007 WL 4256967, at *4 n.8 (M.D. La. Nov. 30 2007) ("Authentication can be accomplished through judicial admissions such as stipulations, pleadings, and production of items in response to subpoena or other discovery request"), quoting 31 Fed. Prac. & Proc. Evid. § 710.

State and the challenged action exists that seemingly private behavior may be fairly treated as that of the State itself."[9] This inquiry is "highly circumstantial and far from precise."[10] "A plaintiff can make such a showing by demonstrating that the private citizen was a willful participant in joint activity with the State or its agents, **or** by demonstrating that the citizen conspired with or acted in concert with state actors."[11]

BBP may be found liable by the jury under either of these two theories: (1) that it was a willful participant in joint activity with the State or its agents and/or (2) BBP conspired with or acted in concert with State actors. The Fifth Circuit's opinion in <u>Morris</u> is instructive. That case involved the arrest of a patron at Dillard's on a shoplifting charge by an off-duty Bossier City police officer working as a private security guard for the store. The district court granted summary judgment for Dillard's, which the plaintiff appealed. The Fifth Circuit noted that "this court has developed a consistent doctrine applying a nexus-type test to determine when a private enterprise such as Dillard's may be subject to constitutional liability."[12]

The Court of Appeals interpreted its "consistent doctrine," beginning with <u>Smith</u>, as imposing constitutional liability on the private entity where "the police and merchant maintained a pre-conceived policy by which shoplifters would be arrested based solely on the complaint of the merchant."[13] The Court stated that "the 'crucial' focus of the inquiry is whether an officer

---

[9] <u>Morris v. Dillard Dep't Stores, Inc.</u>, 277 F.3d 743, 747 (5th Cir. 2001), citing <u>Brentwood Acad. v. Tennessee Secondary Sch. Athletic Assoc.</u>, 531 U.S. 288, 295 (2001) (internal quotation omitted).

[10] <u>Morris</u>, 277 F.3d at 748, citing <u>Brentwood Acad.</u>, 531 U.S. at 295–96.

[11] <u>Stire v. Watson</u>, No. 12-2982, 2013 WL 3944423 at *2 (E.D. La. July 30, 2013), quoting <u>Glotfelty v. Karas</u>, 512 F. App'x 409, 414 (5th Cir. 2013) (emphasis added).

[12] <u>Morris</u>, 277 F.3d at 748, citing <u>Bartholomew v. Lee</u>, 889 F.2d 62, 63 (5th Cir. 1989), <u>Hernandez v. Schwegmann Bros. Giant Supermarkets, Inc.</u>, 673 F.2d 771, 772 (5th Cir. 1982), <u>White v. Scrivner Corp.</u>, 594 F.2d 140, 141 (5th Cir. 1979), <u>Duriso v. K-Mart No. 4195, Division of S.S. Kresge Company</u>, 559 F.2d 1274, 1277 (5th Cir. 1977), and <u>Smith v. Brookshire Bros., Inc.</u>, 519 F.2d 93, 94 (5th Cir. 1975).

[13] <u>Morris</u>, 277 F.3d at 748–49, citing <u>Smith</u>, 519 F.2d at 94–95.

'acted according to a preconceived plan and on the say-so of the private actor, not on the basis of [the officer's] own investigation.'"[14]

### b. BBP secured the authority of law enforcement to respond to protests at the pipeline construction site.

In 2018, the Bayou Bridge Pipeline was under construction in south Louisiana. As planned (and at present, as operated) the pipeline transports oil from Nederland, Texas to St. James Parish, Louisiana.[15] A portion of the pipeline cuts through the Atchafalaya Basin.

Russell Sweeney is a Vice President and Senior Director of Security of Energy Transfer Partners ("ETP")[16] who has "strategic responsibility for physical security" at all ETP facilities and construction sites.[17] Sweeney reports directly to the Executive Vice President and Chief Human Resources Officer for ETP.[18] Hired in February 2017,[19] Sweeney was directed to plan the overall needs for security for the construction of the Bayou Bridge Pipeline.[20]

---

[14] Morris, 277 F.3d at 749, quoting Bartholomew, 889 F.2d at 63.

[15] Ex. 2, Farber Dep. 27:16-28:6, 33:5-13.

[16] Ex. 3, Sweeney Dep. 15:20-22. BBP is "one of the partnerships that's under the umbrella of" Energy Transfer. Sweeney Dep. 24:12-16. Energy Transfer (formerly "Energy Transfer Partners") ("ETP") is a publicly traded limited partnership that, according to a recent press release, "owns and operates one of the largest and most diversified portfolios of energy assets in the United States, with a strategic footprint in all of the major U.S. production basins." https://ir.energytransfer.com/news-releases/news-release-details/energy-transfer-announces-gulf-run-transmission-service (accessed 1/12/23). At the time of the relevant events in this case, BBP witnesses Russell Sweeney, Rodney Winch, and Cary Farber all worked for both ETP and BBP simultaneously.

[17] Id. 20:13-21.

[18] Id. 21:20-24 (identifying Christopher Curia as Sweeney's direct supervisor); Energy Transfer Website, https://energytransfer.com/leadership/ (accessed 1/12/23) (describes Curia's position as Executive Vice President).

[19] Id. 15:23-25.

[20] Id. 29:13-23.

Rodney Winch, ETP's Project Security Manager, is responsible for the majority of the company's physical security efforts.[21] Winch reported directly to Sweeney.[22] Winch was assigned "to oversee the management of physical security for the construction project."[23]

BBP contracted with Chicago-based corporate risk management firm Hillard Heinze for assistance with security services at the pipeline construction project. Hillard Heintze secured the services of two Louisiana-based supervisors, Eddie Langlinais and Steve Monachello. In its contract with Hilliard Heinze, BBP reserved the right to accept or reject security subcontractors engaged by the contractor.[24] Thus, Sweeney was notified that Hillard Heinze sought to hire HUB to work on the pipeline construction security project; Sweeney did not reject HUB,[25] and in fact welcomed them to the project.[26] HUB employs a number of uniformed, private security officers who were not P.O.S.T. certified and whose power of arrest are no more than those of a private citizen.[27]

Winch created a document entitled "Atchafalaya Basin Site Security Plan" and submitted it to Sweeney on June 15, 2018, with the statement "Please see attached for your review. I may need to update the [body-worn cameras] portion as I'm waiting for HUB's policy and want to make sure they match."[28] It circulated in draft form between Sweeney and Winch between June

---

[21] Id. 22:19-23.

[22] Id. 22:3-8.

[23] Winch Dep. 28:20-25.

[24] Ex. 5, Dep'n Ex. 72.

[25] Ex. 2, Sweeney Dep.  57:5-12.

[26] Ex. 2, Sweeney Dep. 70:9-15.

[27] Ex. 6, Regan Dep. 51:21-53:4.

[28] Ex. 7, Dep'n Ex. 82.

15 and 18,[29]  and was on the agenda of a conference call with Sweeney, Winch, Langlinais, Monachello, Hunt, and Fontenot[30] that same week.[31] In what appears to be the final form of the Site Security Plan (unlike previous iterations, the watermark "DRAFT" is deleted and replaced with "CONFIDENTIAL"),[32] its purpose is characterized as identification of security measures for the pipeline construction areas in the Atchafalaya Basin, with specific reference to protests among other possible threats.[33]

Importantly, in the section related specifically to HUB, the Site Security Plan requires HUB to submit post orders for the detail, first to Hillard Heinze and then to the ETP Project Security Manager (Winch) for further review and final approval. Further, HUB's security supervisor is expressly directed to report to the ETP Project Security Manager.[34]

During the Spring of 2018, Sweeney's weekly Bayou Bridge security briefings included the progress of HB 727, proposed legislation to amend La. R.S. § 14:61, the statute defining the offense of Unauthorized Entry of a Critical Infrastructure.[35] BBP had engaged a lobbyist in Baton Rouge, Tommy Williams, to solicit support for the amendments.[36] Grant Ruckel of BBP stated

---

[29] Ex. 7, Dep'n Ex. 82; Ex. 8, Dep'n Ex. 84.

[30] Nathan Hunt was an executive at Hilliard Heinze. Fontenot contacted law enforcement agencies on behalf of BBP.

[31] Ex. 9, Dep'n Ex. 147. According to Sweeney, "the purpose of this thing [the Site Security Plan] is to look to see what we've done previously, what we're doing on like projects, and what we're doing on the Bayou Bridge project, and create a document that we could use as a template going forward with other like projects." Ex. 2, Sweeney Dep. 96:21-97:2. The document itself – which includes specific references to HUB, a Louisiana company, and includes detailed pictures of the Basin itself – conflicts with Sweeney's dismissive testimony about its purpose. But in any event, the Site Security Plan is indicative of BBP's level of oversight of the security being provided to the pipeline construction project.

[32] Compare Ex. 10, Dep'n Ex. 83 and Ex. 11, Dep'n Ex. 85 ("DRAFT") with Ex. 12, Dep'n Ex. 124 ("CONFIDENTIAL").

[33] Ex. 12, Dep'n Ex. 124 at 1.

[34] Ex. 12, Dep'n Ex. 124 at 3.

[35] Ex. 13, Dep'n Ex. 75; Ex. 14, Dep'n Ex. 79.

[36] Ex. 15, Dep'n Ex. 153.

that Mr. Williams was "very instrumental" in securing this legislation, in concert with Tyler Gray, a lobbyist for the oil and gas industry in Louisiana.[37]

As the August 1, 2018 effective date for the amendments to the Unauthorized Entry of a Critical Infrastructure approached, BBP sought to increase the security presence at the pipeline construction sites, and in particular, to secure the presence of sworn law enforcement officers (who could make felony arrests). The original proposal from Hillard Heintze that was incorporated in the October 9, 2017 Tasking Letter between the parties[38] contemplated the "use of unarmed, local security guard personnel" who would report and document alleged criminal or disruptive activity on the project to law enforcement for resolution. The cost of this personnel in Spread 3 (which encompassed the Basin) was projected at $14,400 per month.

But in July 2018, Sweeney tasked Hillard Heintze to provide for an "increased level of effort" to the pipeline construction in the Atchafalaya Basin.[39] That "increased level" was projected to cost $864,000 in the months of July, August, and September 2018. John Orloff of Hillard Heintze wrote Russell Sweeney that "based on the current and projected protestor activity, there will be <u>an increase of LEOs[40] and reduction of guards in August and September</u>.[41]

Thus, in late July 2018, HUB engaged the St. Martin Parish Sheriff's Office ("SMPSO") and officers of the Louisiana State Department of Probation and Parole ("P&P") to provide officers

---

[37] <u>Id</u>.

[38] Ex. 16, Dep'n Ex. 122.

[39] Ex. 17, Dep'n Ex. 127.

[40] Law Enforcement Officers.

[41] Ex. 18, Dep'n Ex. 148 (emphasis added).

with law enforcement powers – including the authority to make felony arrests – as private duty security detail for the pipeline.[42]

SMPSO's General Order 314 governing Extra-Duty Employment provides that "Only P.O.S.T. certified personnel will be allowed this type of employment since actual or potential use of law enforcement powers should be anticipated."[43] It further permits "the use of the St. Martin Parish Sheriff's Office time, facilities, equipment, supplies, uniforms, etc." when approved by the Sheriff,[44] and directs that "the employment duties must be essentially the same as those that would be performed if the employee were assigned those duties while on-duty."[45] The Sheriff gave this approval in a Personal Services Agreement between SMPSO and HUB on July 27, 2018,[46] committing to supply "only Commissioned POST certified personnel, approved, uniformed, and armed" for the detail.[47] On that same day, officers from SMPSO signed contracts with HUB,[48] and certain officers from P&P requested permission to work private duty security for HUB.[49] No contract between HUB and either the Division of Probation and Parole or individual P&P officers was produced in discovery.

---

[42] Eddie Langlinais, who participated in Sweeney's weekly security briefings and emailed Sweeney directly about security issues at the construction site (see Ex. 3, Sweeney Dep. 71:23-72:7, 102:15:103:1), met with Sheriff Theriot and SMPSO Lt. Col. Terry Guidry prior to the July 27, 2018 agreement, R. Doc. 140-28, Langlinais Dep. 15:22–17:22, 22:22-23:1, 125:14–126:11; R. Doc. 140-26, Theriot Dep. 37:23–38:20; R. Doc. 140-27, Terry Guidry Dep. 41–42.

[43] Ex. 19, Dep'n Ex. 111 (Sect. III.B.).

[44] Id. at Sect. VI.B; Id. at Sect. V.K.

[45] Id. at Sect. VI.B

[46] Ex. 20, Dep'n Ex. 62.

[47] Id.

[48] Ex. 21, Dep'n Ex. 108.

[49] Ex. 22, Dep'n Ex. 16; Ex. 23, Dep'n Ex. 31; Ex. 24, Dep'n Ex. 44.

On August 1, BBP's Grant Ruckel forwarded to Russell Sweeney, Cary Farber, and Chuck Frey of BBP[50] a reminder from LMOGA lobbyist Tyler Gray that the felony amendments to La. R.S. § 14:61 were effective that day.[51]

> **c. The P&P officers and SMPSO deputies working on the Bayou Bridge security detail were directed to make arrests of protesters for Unauthorized Entry of a Critical Infrastructure.**

The evidence shows that the day before the arrests, and the morning of the arrests, the decision had been made to make arrests at the construction site.

**August 8, 2018:**

**1:40 p.m.:** Brandon Thompson, one of the P&P officers scheduling the P&P officers working the HUB detail, sent an email—received by all P&P Defendants—with a series of instructions, including instructions stating that "[a]t the beginning of this detail, we were told not to engage with the opposition. However, as the work increases and the opposition are getting aggressive, the "head guy" would like for us to do a little more. He would like us to be more proactive in moving the opposition when they are obstructing work. If they do not move, then contact the Sheriff's Office and work together in order to have them removed. Also take pictures and videos at ALL times to submit to HUB WATCH COMMANDER . . . . Yes, they told us not to do anything before, but like the schedule, things change."[52]

**2 p.m.:** Angela Deere of HUB emailed Brandon Thompson and Christy Crochet (the other P&P scheduler for the private duty detail) a document titled "Special Post Orders," directing "please see attached post orders, if you have any questions let me know."[53] The document states

---

[50] Farber was BBP's senior engineer on the pipeline construction project; Frey worked with public relations for BBP.

[51] Ex. 25, Dep'n Ex. 89.

[52] Ex. 26, Dep'n Ex. 177.

[53] Ex. 27, Dep'n Ex. 163. A "post order" is a term of art in law enforcement; it "advises an employee of the specific duties and responsibilities that are associated with a specific assignment area."   See, e.g., Paul v. Elayn Hunt Corr.

that the order applies "to all Law Enforcement Officers / Deputies; regardless of rank, position, shift, post or work assignment. As an Officer during your tour of duty you shall act in the best interest of Bayou Bridge Pipeline, as well as HUB Enterprises, Inc."[54]  The document further instructs officers to detain individuals trespassing in the "pipeline right of away [sic] (ROW)" and request that a sheriff's deputy "respond to the location and transport the individual from the scene. A copy of House Bill 727–Act No. 692[55] is attached for reference."[56]  In a separate section titled "Use of Force," the document states "We understand that some scenarios may not be a current criminal act, but can escalate into criminal activity if not recognized and effectively interrupted."[57]

HUB President Dwayne Regan authored the Post Orders and considered it a "general outline of what's required for that particular detail."[58]  When directing that officers "act in the best interest of Bayou Bridge Pipeline, as well as HUB Enterprises, Inc." Regan meant "To protect Bayou Bridge Pipeline's assets, their equipment, contractors, etcetera. Not act adversely toward Bayou Bridge."[59] Law enforcement officers working the detail considered post orders from HUB to be instructions regarding their day-to-day job duties as part of the security detail for the pipeline construction project "because it was a HUB detail, so it was just them telling us."[60]

---

Center, 666 F. App'x. 342, 348 n.6 (5th Cir. 2016). Waversun Guidry testified that "post orders were sometimes used by the people that were contracting or requesting the extra duty detail to indicate any particular specific aspects of the extra duty detail." Ex. 28, W. Guidry Dep. at 156.

[54] Ex. 29, Dep'n Ex. 164.

[55] Codified at La. R.S. § 14:61; however, the attachment to the "Special Duty Post Orders" only contained the text of Act No. 692 of 2018, which expanded the definition of "critical infrastructure" and the statutory term "pipeline," but did not amend La. R.S. § 14:61 (A), which defined the conduct that constitutes "unauthorized entry of a critical infrastructure."

[56] Ex. 29, Dep'n Ex. 164.

[57] Id.

[58] Ex. 6, HUB 30(b)(6) (Regan) Dep. 98:13-14.

[59] Id. 114:15-23.

[60] Ex. 30, Adams Dep. 57:21-58:5.

    **3 p.m.:** Thompson forwarded the Post Orders to the P&P officers (including the P&P Defendants), telling the recipients to "please review the attached document from HUB. It has directions and additional information regarding the detail. Thanks for all your help with this detail."[61]

    **4 p.m.:** HUB employee Deere sent a text message to P&P schedulers Thompson and Crochet stating, "Tomorrow:  St. Martin is going out with 2 deputies and making arrests at the chipper sites. They have several warrants also. When making arrests, they would like 1 P&P officer to ride back with 1 deputy on the boat. The other deputy will stay behind and assist in making any other arrest until they get back."  Ms. Deere told the P&P officers to call her if they had any questions.[62]

    **8 p.m.:** Ms. Crochet re-entered the text chain and reported that "I got this text from one of the officers that was at Pigeon today. They are going to be putting a barge in the middle of a dead-end bayou that cuts across the path. They will be there tomorrow to try and stop it. They need to make sure there's enough people there to deal with them as they are getting in the way and not moving even if we threaten arrest. They didn't move until we surrounded them and two officers got in the water."[63] Ms. Deere responded that "[t]his is why [HUB is] having 2 St Martin Officers out there tomorrow to make arrests"[64] and noted that SMPSO would be "doubling their forces tomorrow" and "working to secure a warrant."[65]

---

[61] Ex. 31, Dep'n Ex. 42.

[62] R. Doc. 137-18, HUB Text Messages at 2.

[63] Id. at 3.

[64] Id.

[65] Id. at 4.

P&P Defendants' testified that they received the post order prior to their shift on August 9, 2018. Defendant Ward stated contemporaneously with the arrest that he was uncertain of the statute under which Plaintiffs were being arrested. Defendant Ward used a document on HUB letterhead, likely the Special Detail Post Orders, as a reference while he was completing Eric Moll's probable cause affidavit in the car on the way to the St. Martin Parish jail.[66]

This proof amply demonstrates that BBP secured the law enforcement authority of the SMPSO deputies and the P&P officers in order to make felony arrests of pipeline protesters.

### d. The arrests were made at the direction of BBP's authorized representative at the construction site, a pipeline construction inspector named "Larry."

At the scene of the arrests, a distinctive man in an orange shirt, black sunglasses, and black-and-white baseball cap arrived on the last of the five airboats present. The videos show this man gesturing towards Karen Savage and asking foreman Carl Ledet if she was on the right of way. "If she's on the right of way, I want her arrested!"[67] The man in the orange shirt, now outside of the frame then said of the Plaintiffs, "All three of them right there are in the right-of-way." Plaintiffs Spoon and Moll, still on their boats in the water, responded that they were not in the right of way. The man in orange replied, "That's MY right of way."[68]

Coming back into the frame of the video, the man in orange turned to the airboat carrying Defendants Black and Adams in the Pipeline Canal and yelled, "Hey, you need to arrest those three. They're in the right of way. I'm filing charges."[69]  At one point, as Moll moved his kayak close to the airboat holding his friends; the man in the orange shirt, in a different airboat, crouched

---

[66] R. Doc. 137-24, Declaration of Eric G. Moll at 1-2 ¶4. Defendant Ward testified that he began working on the probable cause affidavit when he was in the vehicle traveling to the jail. Ex. 32, Ward Dep. at 85:13-20.

[67] R. Doc. 140-14 (conventional filing), IMG_1206 at 0:32-0:39.

[68] Id. at 0:55–1:02.

[69] Id. at 1:04–:11.

toward Moll.[70] One of the other construction workers called the man in orange "Larry" during this encounter.

Carl Ledet, Sr., the foreman for Sunland Construction on the site, believed that "Larry" was an inspector for Bayou Bridge.[71] Ledet assumed that Larry worked for Bayou Bridge "because that's who inspectors work for."[72] Ledet further testified that he was instructed to notify the inspector on site if there was a problem with protesters.[73]

Ledet was correct. In their First Set of Answers to Plaintiffs' Interrogatories, BBP stated that it contracted with two companies, Hillard Heintze and Frontier Integrity Solutions ("FIS"), to provide security for construction of the pipeline.[74] FIS invoices to BBP show that an individual named Larry Gordon worked in the position of "Utility Inspector 3" on Spread 3[75] on August 9, 2018—the date of Plaintiffs' arrests.[76]

Plaintiff Moll had been in close proximity to the man in the orange shirt, who leaned close to him at one point on the date of the arrests.[77] Having been shown pictures from a Facebook page under the name "Larry Gordon,"[78] Moll recognizes Larry Gordon as the "Larry" in the orange shirt who was present on the day of the arrests.[79]

---

[70] Ex. 33 (conventional filing), "Img_1203.mov" at 1:24.

[71] Ex. 34, Ledet Dep. 83:24-84:23, 96:2-21.

[72] Ex. 34, Ledet Dep. 97:22-98:14; 103:8-19.

[73] Ledet Dep. 38:18-21 ("We were supposed to—if any protesters come up there we had to call—we had to let the inspector know, and they would call the Chief and all that.").

[74] R. Doc. 74-3 at 11.

[75] Ex. 2, Farber Dep. 27:11-28:14 (testifying that "Spread 3" was the area of pipeline construction running through the Atchafalaya Basin).

[76] Ex. 35, Excerpts from August 2018 FIS Invoice (Spread 3).

[77] Ex. 33, "Img_1203.mov" at 1:24.

[78] Facebook, https://www.facebook.com/larry.gordon.3386 (accessed 1/12/23).

[79] Ex. 36, Declaration of Eric Moll (January 13, 2023).

That "Larry" was an on-site inspector is significant. Energy Transfer is a member[80] of the Interstate Natural Gas Association of America (INGAA) Foundation.[81] The version of the Foundation's publication <u>A Practical Guide for Pipeline Construction Inspectors</u> current as of August 9, 2018 characterizes the role of the inspector as follows:

> **The Inspector acts as the Owner Company's authorized representative for non-financial matters**, continuously observes the Contractor's progress and monitors all activities in their assigned areas in accordance with codes and standards; regulatory requirements; **Owner Company safety** and environmental requirements, drawings, plans, and specifications; as well as the terms of the construction contract or agreement.[82]

Thus Larry Gordon, the on-site inspector for FIS at the time of the arrests, was BBP's "authorized representative" when he directed the P&P Defendants, "You need to arrest those three. They're in the right-of-way. I'm filing charges."[83]

Moreover, P&P Defendant Adams stated that she arrested Plaintiffs on the say-so of the "company man,"[84] correctly assuming, as did Ledet, that the on-site inspector (Larry Gordon) represented BBP.

And P&P Defendant Matherne testified that "if the complainant wouldn't have formally complained then there would have been no arrest . . . had he not have said – have they not have said they wanted them arrested then, in essence, no, they wouldn't have been arrested."[85]

---

[80] INGAA Foundation Website, https://www.ingaa.org/Foundation/FDNmembers.aspx?id=32 (accessed 1/12/23).

[81] "The Foundation's primary activity is to sponsor research aimed at promoting natural gas use and safe, efficient pipeline construction and operation." INGAA Foundation Website, https://www.ingaa.org/Foundation/16435.aspx (accessed 1/12/23).

[82] <u>A Practical Guide for Pipeline Construction Inspectors</u> (CEPA Foundation Inc. and INGAA Foundation Inc. March 2016) at 11 Section 6.0. Kirk Peterman of ETP is listed as one of the Working Group Members for this document. <u>Id.</u> at 3.

[83] Ex. 33, "Img_1203.mov" beginning at 1:07.

[84] Ex. 30, Adams Dep. at 67:5-68:8.

[85] Matherne Dep. 149:11-14, 149:23-150:1.

At a minimum, then, there are at least genuine issues of material fact as to whether the authorized representative of BBP directed the arrests of the Plaintiffs.

> **2. BBP is not shielded by the independent contractor defense because it had operational control of the security provided to the pipeline construction project by HUB, the P&P officers, and the SMPSO deputies.**

BBP argues that because it contracted with Hillard Heinze, which in turn contracted with HUB, which in turn contracted with the P&P officers and the SMPSO Defendants, BBP is not liable for the actions of these parties on August 9, 2018. Its Statement of Uncontested Material Facts is largely a repetition, with slight changes of emphasis, of this argument.

But BBP's theory has a fatal flaw. While, generally speaking, a principal is not vicariously liable for the actions of its contractors or subcontractors,[86] this rule does not apply where the principal "retains or exercises operational control" over the contractors and/or subcontractors.[87]

Thus, the decisive factor in the analysis of BBP's independent contractor defense is whether BBP had operational control over HUB, the P&P Defendants, and/or the SMPSO Defendants with respect to Plaintiffs' arrests. Under Louisiana law, a principal has operational control over an independent contractor "when the principal reserves the right to supervise or control the work of the independent contractor ... or gives express or implied authorization to an unsafe practice."[88] There must be evidence that the principal exercised "'control over the operative

---

[86] Even in the summary judgment context, "the principal seeking to avoid vicarious liability through the independent-contractor exception must establish the existence of an independent-contractor relationship between it and the allegedly negligent contractor." Cortez v. Lemorak Ins. Co., No. 20-2389, 2022 WL 3092859, at *6 (E.D. La. Aug. 3, 2022), quoting Coleman v. BP Expl. & Prod. Inc., No. 19-102, 2020 WL 6292491, at *3 (S.D. Tex. Oct. 27, 2020), aff'd, 19 F.4th 720 (5th Cir. 2021) (applying Louisiana law) (internal quotations omitted).

[87] Renwick v. PNK Lake Charles, L.L.C., 901 F.3d 605, 612 (5th Cir. 2018); Nguyen v. La. State Bd. of Cosmetology, 236 F.Supp.3d 947, 963–64 (M.D. La. 2017) (§ 1983 case); Cortez, 2022 WL 3092859, at *6.

[88] Renwick, 901 F.3d at 612, quoting Sandbom v. BASF Wyandotte Corp., 95-0335 (La. App. 1 Cir. 4/30/96), 674 So. 2d 349, 353–54.

detail of doing any part of the work,'" such that the "'contractor is not entirely free to do the work in his own way.'"[89]

In this context, it is noteworthy that "[t]he existence of an independent contractor agreement is not necessarily dispositive of the issue of whether [a worker] is an independent contractor, as opposed to an employee .... The courts will inquire as to the real nature of the relationship and the degree of control exercised or ability of control by the [company] over the [individual's] activities."[90]

Thus, where the evidence creates a question of fact whether the principal's role in the work "went beyond making suggestions or recommendations which need not necessarily be followed, but instead rose to the level of control over the operative detail of the work, such that [the contractor] was not entirely free to do the work in its own way," summary judgment should be denied.[91] The Court of Appeals continued:

> In other words, the evidence would permit the conclusion that [the principal] "**retained at least some degree of control** over the manner in which [the contractor's] work was done," and thus exercised operational control.[92]

---

[89] Renwick, 901 F.3d at 613, quoting Grammer v. Patterson Servs., Inc., 860 F.2d 639, 644 (5th Cir. 1988) (quoting RESTATEMENT (SECOND) OF TORTS, § 414, cmt. a (1965), and citing Klein v. Cisco-Eagle, Inc., 37,398 (La. App. 2nd Cir. 9/24/03), 855 So.2d 844, 850).

[90] Henderson v. Atmos Energy, 509 F. Supp. 3d 625, 634 (E.D. La. 2020), quoting Arroyo v. E. Jefferson Gen. Hosp., (06-799 La.App. 5 Cir. 3/13/07), 956 So. 2d 661, 664; see also Hicks v. BP Exploration & Production, Inc., 310 F. Supp. 3d 754, 761 (E.D. La. 2018) ("the BP defendants appear to assume that the use of the words 'independent contractor' in a contract, accompanied by boilerplate language about 'control' and 'supervision,' is sufficient under Louisiana law to establish the existence of such a relationship. It is not.").

[91] Renwick, 901 F.3d at 614, quoting LeJeune v. Shell Oil Co., 950 F.2d 267, 270 (5th Cir. 1992), and Grammer, 860 F.2d at 644 (internal quotations and citations omitted).

[92] Renwick, 901 F.3d at 614, quoting LeJeune, 950 F.2d at 270; see also Cortez, 2022 WL 3092859 at *6 (denying summary judgment and holding that "to determine whether someone is an independent contractor, the court must look at the degree of control over the work."), quoting Bouquet v. Williams, 2016-0134 (La. App. 1 Cir 10/28/16), 206 So. 3d 232, 237.

There is ample evidence raising genuine issues of fact regarding BBP's operational control over HUB, the P&P Defendants, and the SMPSO Defendants:

- Russell Sweeney, Vice President and Senior Director of Security of Energy Transfer Partners, who has "strategic responsibility for physical security" at all ETP facilities and construction sites,[93] participated in weekly briefings on security for the Louisiana pipeline construction project.[94]

- Sweeney received weekly, and sometimes daily, reports about protesters at the construction site.[95]

- Sweeney directly received emails from the construction site about specific incidents encountered by security personnel at the pipeline construction site.[96] At his request, specific information about protesters, including their pictures, was forwarded to him from Louisiana.[97]

- Sweeney received text messages from Louisiana regarding incidents at the construction site.[98]

- In its contract with Hillard Heinze, BBP reserved the right to accept or reject security subcontractors engaged by Hillard Heintze.[99] Sweeney was notified that Hillard Heinze sought to hire HUB to work on the pipeline construction security project; Sweeney did not reject the hiring of HUB.[100]

- In the "Atchafalaya Basin Site Security Plan" authored by Winch and approved by Sweeney, HUB is required to submit post orders for the detail, first to Hillard Heinze and then to the ETP Project Security Manager (Winch) for further review and final approval.[101]

---

[93] Ex. 3, Sweeney Dep. 20:13-21.

[94] Id., 70:24-71:19.

[95] Ex. 13, Dep'n Ex. 75; Ex. 14, Dep'n Ex. 79; Ex. 38, Dep'n Ex. 88; Ex. 39, Dep'n Ex. 92; Ex. 40, Dep'n Ex. 93.

[96] Ex. 41, Dep'n Ex. 74; Ex. 42, Dep'n Ex. 76; Ex. 43, Dep'n Ex. 77; Ex. 44, Dep'n Ex. 78 (emails between Langlinais and Sweeney).

[97] Ex. 42, Dep'n Ex. 76; Ex. 43, Dep'n Ex. 77; Ex. 45, Dep'n Ex. 80; Ex. 2, Sweeney Dep. 105:3-13 (Langlinais and/or Monachello would sometimes text Sweeney).

[98] Ex. 2, Sweeney Dep. 102:23-104:1.

[99] Ex. 5, Dep'n Ex. 72.

[100] Ex. 2, Sweeney Dep. 57:5-12.

[101] Ex. 12, Dep'n Ex. 124 at 3.

- In the Site Security Plan, HUB's security supervisor is expressly directed to report to the ETP Project Security Manager.[102]

- At Sweeney's direction, an increased level of security for the pipeline construction project was to begin in July 2018, specifically including an increase of law enforcement officers and reduction in non-law enforcement officer "guards" at the construction site.[103]

- Following this directive, HUB hired SMPSO Deputies and P&P Officers who had law enforcement power to provide security for the project.[104]

- With respect to SMPSO, HUB contracted directly with the Sheriff, requiring that SMPSO supply "only Commissioned POST certified personnel, approved, uniformed, and armed" for the detail.[105]

- Between August 5-8, 2018, Langlinais participated in daily security conference calls, reviewed daily security reports, and daily met with SMPSO leadership concerning opposition actions in Basin, specifically including coordinating the response to protesters.[106]

- Sweeney received a direct report of the Plaintiffs' arrests from Langlinais.[107]

- Within hours of the arrests, Sweeney wrote a BBP in-house attorney that the "Sheriff would like us to get a TRO on these people so that they can serve them."[108]

- At the end of August 2018, Sweeney discussed the effectiveness of the use of the felony amendments, writing in an email with the subject line "BBP Activists and the August 1 LA Felony Law": "The LA felony infraction of Unauthorized Entry of Critical Infrastructure in violation of Louisiana Revised Statutes (LRS) 14:62 is helping us reduce the potential for ROW incursions by protestors."[109]

---

[102] Id. at 3.

[103] Ex. 18, Dep'n Ex. 148.

[104] Ex. 20, Dep'n Ex. 62; Ex. 21, Dep'n Ex. 108; Ex. 22, Dep'n Ex. 16; Ex. 23, Dep'n Ex. 31; Ex. 24, Dep'n Ex. 44.

[105] Ex. 20, Dep'n Ex. 62.

[106] R. Doc. 140:28, Langlinais Dep. 54-57; Langlinais August 2018 timesheets (to be filed under seal) at 3. As discussed above, Langlinais participated in Sweeney's security briefings and emailed Sweeney directly about security issues at the construction site (see Ex. 3, Sweeney Dep. 71:23-72:7, 102:15:103:1).

[107] Ex. 46, Dep'n Ex. 90; Ex. 47, Dep'n Ex. 91.

[108] Ex. 48, Email Sweeney to Pieper August 9, 2018 at 1:50 pm (emphasis added).

[109] Ex. 1, Dep'n Ex. 152.

- A social media post referenced by Sweeney was by "an individual who has expressed interest in joining L'eau Est La Vie Camp and protest actions," who "wrote about her recent decision to not go to Louisiana and risk being arrested and charged with a felony."[110]

### 3. BBP was a "special employer" of the P&P officers and the SMPSO deputies under Louisiana law.

Article 2320 of the Civil Code provides that "[m]asters and employers are answerable for the damage occasioned by their servants and overseers, in the exercise of the functions in which they are employed." Louisiana courts have drawn distinctions between an employee's "general employer" and the "special employer" to whom the employee might be lent to work temporarily. Since 1978 the Louisiana Supreme Court has recognized that both the general employer and the special employer can be held liable for the actions of the employee.[111]

Furthermore, this dual liability doctrine applies equally to temporary employment agencies and the companies to whom they provide workers:

> The loaned employees are furthering the business of [temp agency] at the identical time when they are also furthering the business of the special employer. Put simply, both employers had contemporaneous control over [the employee], and both contemporaneously benefitted from his labor. It is therefore reasonable that considering the overlapping control and shared financial interest that they share liability.[112]

For the reasons set forth above, the evidence demonstrates BBP's operational control over HUB, and through HUB, the SMPSO and P&P Defendants. As the "special employer" of the other Defendants, BBP is vicariously liable for their actions.

---

[110] Id.

[111] LeJeune v. Allstate Ins. Co., 365 So. 2d 471 (La. 1978).

[112] Morgan v. ABC Mfr., 97-0956 (La. 5/1/98), 710 So. 2d 1077, 1083; see also Blair v. Tynes, 621 So. 2d 591, 599 (La. 1993) (holding that negligent acts of sheriff's deputies hired by American Legion to provide traffic control for special event resulted in vicarious liability for both the sheriff's office and American Legion).

**B.    Genuine issues of material fact surrounding the events leading up to Plaintiffs' arrests and P&P Defendants' lack of probable cause preclude summary judgment on Plaintiffs' false-arrest claims.**

Plaintiffs' Complaint seeks redress for "false detention, arrest, and imprisonment."[113] The Fourth Amendment protects persons against unreasonable seizures.[114] A person has been "seized" for purposes of the Fourth Amendment when "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."[115] The constitutional tort for false arrest occurs where a seizure is made without probable cause to believe that the person seized has committed a crime.[116] The Supreme Court analyzed the false arrest tort under the Fourth Amendment in Wallace v. Kato:

> False arrest and false imprisonment overlap; the former is a species of the latter. "Every confinement of the person is an imprisonment, whether it be in a common prison or in a private house, or in the stocks, **or even by forcibly detaining one in the public streets**; and when a man is lawfully in a house, it is imprisonment to prevent him from leaving the room in which he is."[117]

In Ornelas v. United States, the Supreme Court held that the determination of probable cause could be divided into two prongs: (1) "the events which occurred leading up to the stop or

---

[113] First Amended Complaint, ECF No. 28 at 17 ¶69.

[114] Manuel v. City of Joliet, 580 U.S. 357, 364 (2017).

[115] California v. Hodari D., 499 U.S. 621, 627–28 (1991), quoting United States v. Mendenhall, 446 U.S. 544, 554 (1980); United States v. Morris, 40 F.4th 323, 327 (5th Cir. 2022) ("In its most general formulation, a stop occurs when someone submits to a governmental show of authority that would cause a reasonable person to believe that she was not free to leave.")

[116] See Manuel, 137 S. Ct. at 917; Wallace v. Kato, 549 U.S. 384, 389 (2007) ("[False imprisonment] provides the proper analogy to the cause of action asserted against the present respondents for the following reason: The sort of unlawful detention remediable by the tort of false imprisonment is detention without legal process . . . and the allegations before us arise from respondents' detention of petitioner without legal process in January 1994. They did not have a warrant for his arrest.") (internal citations omitted).

[117] Wallace v. Kato, 549 U.S. 384, 388–89 (2007), quoting M. Newell, Law of Malicious Prosecution, False Imprisonment, and Abuse of Legal Process § 2, p. 57 (1892) (emphasis added); see also Nieves v. Bartlett, 139 S. Ct. 1715, 1726 n.2 (2019) ("[W]e need not distinguish between the torts of false imprisonment and false arrest, which are 'virtually synonymous.'").

search," and (2) "the decision whether these historical facts, viewed from the standpoint of an objectively reasonable officer, amount to . . . probable cause."[118] The first prong is strictly a factual question, while the second prong is a mixed question of law and fact.[119] The facts considered are those "within the officer's knowledge (at the time of the arrest)" and "must be sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."[120] "The facts must be known to the officer at the time of the arrest; post-hoc justifications based on facts later learned cannot support an earlier arrest."[121] Courts deny summary judgment on false-arrest claims when the factual underpinnings of probable cause are in dispute, regardless of an assertion of qualified immunity.[122]

---

[118] 517 U.S. 690, 697 (1996).

[119] Id.; see also Seaboard Oil Co. v. Cunningham, 51 F.2d 321 (5th Cir. 1931) ("In a clear case, on undisputed facts, probable cause is a question of law for the court. . . . But where the evidence is in substantial conflict or reasonable men may draw different conclusions from it, probable cause is a question for the jury. Of course, it is the duty of the court to instruct the jury as to what facts will constitute probable cause or want of it, leaving it to the jury to pass upon the credibility of the witnesses and find the facts.") (internal citations omitted).

[120] Hogan v. Cunningham, 722 F.3d 725, 731 (5th Cir. 2013), quoting Michigan v. DeFillippo, 443 U.S. 31, 37 (1979).

[121] Club Retro, L.L.C. v. Hilton, 568 F.3d 181, 204 (5th Cir. 2009)

[122] See Arizmendi v. Brownsville Ind. Sch. Dist., No. 2017 WL 4479951 (S.D. Tex. May 26, 2017) ("The court may make its own legal determination of probable cause in a § 1983 claim. Nevertheless, where facts relied upon to show probable cause in a § 1983 claim are controverted, they must be resolved by the jury before such legal determination can be made."), citing Garris v. Rowland, 678 F.2d 1264, 1270 (5th Cir. 1982), rev'd on other grounds by Arizmendi v. Gabbert, 919 F.3d 891 (5th Cir. 2019); Griffith v. Hughes, No. 07-9738, 2009 WL 10680161, at *5 (E.D. La Dec. 16, 2009) ("The foregoing recitation of the parties' testimony regarding what took place leading up to arrest compels the conclusion that Harrison and Hughes are not entitled to summary judgment on Griffith and Learned's claims for false arrest. . . . Harrison's and Hughes' testimony regarding the facts that predicated the arrest is completely contradicted by the Plaintiffs' version of the facts, and it will be up to the jury to decide which version is truthful. If the jury credits the officers' version of the events, then no constitutional violation for false arrest will have occurred and the officers will be entitled to qualified immunity on that claim. If the jury credits Plaintiffs' version of the events, however, then there will have been no probable cause to arrest them on the charges asserted, and Defendants do not question that Plaintiffs' right to be free from false arrest was clearly established at the time of the incident. Thus, if Plaintiffs are believed then Harrison and Hughes will have violated the Plaintiffs' clearly established right to be free from false arrest and qualified immunity will not apply.").

BBP does not attempt to assert that probable cause existed to arrest Plaintiffs for violating the critical infrastructure law, La. R.S. § 14:61. Instead, BBP argues that probable cause existed to arrest Plaintiffs for a different crime – simple obstruction of a highway of commerce, La. R.S. § 14:97.[123] BBP has never pled the affirmative defense that probable cause justified arrests of the Plaintiffs under 14:97, which were not the basis for the August 9, 2018 arrests. And this defense, which is a subset of the doctrine of qualified immunity, is not available to private actors such as BBP who are sued for acting in concert with government officials to violate constitutional rights. And in any event, the facts available to the arresting officers prior to Plaintiffs' arrests show that they did not have probable cause for arrest under 14:97.

> 1. **BBP has waived the affirmative defense of probable cause to arrest Plaintiffs under La. R.S. 14:97.**

It is true that the defense of qualified immunity to a false arrest claim can be comprised by the existence of probable cause on a charge different than the one on which the plaintiff is arrested.[124] But this defense requires facts in addition to those pled by the plaintiff, and is therefore an affirmative defense[125] that is waived if not raised in a defendant's responsive pleadings, or at least at a time which permits the plaintiff to take discovery on the defense.[126] In this case, BBP did not raise the existence of probable cause on a charge other than 14:61 in their Answer and

---

[123] "Simple obstruction of a highway of commerce is the intentional or criminally negligent placing of anything or performance of any act on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, which will render movement thereon more difficult." La. R.S. § 14:97.

[124] See Devenpeck v. Alford, 543 U.S. 146, 154-56 (2004); Club Retro, L.L.C. v. Hilton, 568 F.3d 181, 204-06 (5th Cir. 2009); Loupe v. O'Bannon, No. 14-00573-BAJ-RLB 2018 WL 343850 at *4-5 (M.D. La. 1/8/18).

[125] Pasco ex rel. Pasco v. Knoblauch, 566 F.3d 572, 577 (5th Cir. 2009) (the alternative probable cause defense must be raised as an affirmative defense), citing 5 Fed. Prac. & Proc. Civ. § 1270, n.11, quoting Bay Area Roofers Health and Welfare Trust v. Sun Life Assurance Company of Canada, No. 13–cv–04192–WHO, 2013 WL 6700017, *2 (N.D. Cal. 12/19/13) ("An affirmative defense raises new facts and arguments that, if true, will defeat plaintiff's claim").

[126] LSREF2 Baron, L.L.C. v. Tauch, 751 F.3d 394, 402 (5th Cir. 2014); Lebouef v. Island Operating Co., Inc., 342 Fed.Appx. 983 (5th Cir. 2009).

Affirmative Defenses.[127] In fact, they never pled qualified immunity at all.[128] At best, BBP asserted as a defense "all applicable affirmative defenses pled by other defendants."[129] But this certainly runs afoul of the rule that a defendant must plead with "enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced."[130] Rather, the defense was raised for the first time in the December 2, 2022 motion for summary judgment – months after the deadline for amending pleadings and for discovery had expired.[131]

Thus, Plaintiffs had no opportunity to depose any of the arresting officers regarding (1) whether they, or their agency, have ever charged an individual with violation of La. R.S. 14:97 in the context of allegedly obstructing a navigable waterway;[132] (2) which facts known to the arresting officers met the definition of 14:97; (3) whether the arresting officers were even aware of these statutes; and (4) why they did not charge Plaintiffs under them. Plaintiffs were also

---

[127] R. Doc. 58.

[128] Id.

[129] Id. at 9, ¶28.

[130] LSREF2 Baron, L.L.C., 751 F.3d at 398, citing Rogers v. McDorman, 521 F.3d 381, 385–86 (5th Cir.2008), quoting Woodfield v. Bowman, 193 F.3d 354, 362 (5th Cir. 1999).

[131] Notably, in the cases in which an affirmative defense was permitted to be raised for the first time in a summary judgment motion, plaintiffs' opportunity to take discovery on the defense had not elapsed. See, e.g., Motion Medical Technologies, L.L.C. v. ThermoTek, Incorporated, 875 F.3d 765, 771-72 (5th Cir. 2017) ("ThermoTek got fair notice. It learned of the preemption defense at a pragmatically sufficient time and suffered no prejudice. The preemption issue first surfaced at the summary judgment stage before discovery closed and nearly two years before trial"); Pasco ex rel. Pasco v. Knoblauch, 566 F.3d 572, 577-78 (5th Cir. 2009) ("Here, though Knoblauch raised qualified immunity fifty-two months after the complaint was filed, substantial time remained before trial for Pasco to respond to the defense. Knoblauch asserted qualified immunity two months before discovery was due and six months before the pretrial conference").

[132] See Nieves v. Bartlett, ---U.S.---, 139 S.Ct. 1715, 1727 (2019) ("Although probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so. In such cases, an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech"). In such circumstances, the plaintiff must present objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been. Id. Plaintiffs have been precluded from seeking such objective evidence by the belated assertion of probable cause under 14:97.

deprived of the opportunity to take the corporate deposition of the Division of Probation and Parole on the first of these questions.

BBP should not be allowed to raise this defense months after discovery has closed (for the second time), let alone the longer time that has elapsed since the deadline for amending pleadings. The Court should exercise its discretion to refuse to consider this argument.

### 2. BBP is not entitled to assert qualified immunity.

BBP faces an additional obstacle to any defense based on probable cause under a statute other than the one on which Plaintiffs were arrested. As held by the Fifth Circuit in Pasco, this defense arises under the doctrine of qualified immunity.[133] But qualified immunity is not available to non-governmental entities such as BBP who act in concert with state officials to violate constitutional rights.[134] BBP has made no argument whatsoever that it is entitled to the protections of the doctrine under the test set forth in Wyatt or Richardson v. McKnight.[135] Its assumption that it can stand in the position of the arresting officers and assert probable cause for an uncharged offense is foreclosed by Wyatt.

### 3. On the facts available to the arresting officers, Plaintiffs could not be arrested for Simple Obstruction of a Highway of Commerce under La. R.S. 14:97.

Even if this Court were to consider the "alternative probable cause" defense raised by BBP, genuine issues of material fact as to that defense preclude summary judgment. The crime of simple obstruction of a highway of commerce occurs when there is intentional or negligent performing of

---

[133] Pasco, 566 F.3d at 577-78. BBP may claim that it is not asserting qualified immunity, but rather negating the element of absence of probable cause that Plaintiffs must prove to prevail on their false arrest claim. If that were true, however, there would have been no need for the Pasco Court to consider the waiver issue, because negation of an element of a plaintiff's claim is not an affirmative defense in the first place.

[134] Wyatt v. Cole, 504 U.S. 158, 168-69 (1992).

[135] 521 U.S. 399, 403-04 (1997) (private party seeking qualified immunity must show a tradition of immunity firmly rooted in the common law which is supported by such strong policy reasons that Congress would have specifically so provided had it wished to abolish the doctrine).

any act on a navigable waterway "which will render movement thereon more difficult." Scant caselaw exists interpreting this law's application to navigable waterways, as opposed to roads or highways, indicating the infrequency with which this offense is charged. Opinions discuss the applicability of the law to private canals[136] but do not explore what it means to render travel on a navigable waterway more difficult.

Title 33, Section 162.75 of the Code of Federal Regulations contains an analogous prohibition: "A clear channel shall at all times be left open to permit free and unobstructed navigation by all types of vessels and tows using the various waterways covered by the regulations in this section."[137] Interpreting this language, the Eleventh Circuit held that "an obstruction to navigation is to be determined by reference to all the relevant facts and circumstances, including the percentage of the waterway's width that is obstructed."[138]

As the video evidence and deposition testimony show, it was the action of the air boats that blew the canoe into the smaller channel.[139] At that point, that Plaintiffs' canoe and kayak occupied far less of the waterways' widths than the two airboats carrying P&P Defendants, three additional airboats on the scene, and the construction barge. None of the facts known and expressed by the arresting officers support the notion that the barge (or any other vessel) was inhibited from navigating the bayou on account of Plaintiffs' canoe and kayak.

---

[136] See, e.g., Vermillion Corp. v. Vaughan, 356 So. 2d 551 (La. App. 3rd Cir. 1978).

[137] See also 33 USC § 403, Obstruction of navigable waters generally ("The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited.").

[138] Orange Beach Water, Sewer, and Fire Protection Authority v. M/V Alva, 680 F.2d 1374, 1380 (11th Cir. 1982).

[139] Ex. 37, Matherne Dep. 84:24-85:5, 88:10-14, 88:22-24.

Moreover, BBP overstates its case that Plaintiffs admitted to obstructing the waterway. The deposition testimony indicates that they did not believe they were, or even could, do so. Moll testified that the Plaintiffs were holding space in the waterway but not blocking the barge:

> [W]ith the understanding that we actually could not block the barge, and it was really more about us being there, showing our presence, you know, showing that people were out, you know, opposing the project in one way or another. And to demonstrate that we do have right to use the waterways. And Everyone has a right to use public waterways. . . .
>
> Q. Okay. And then just to nail it down again by saying you could not block the barge, you mean that the barge could have pushed you out of the way?
>
> A. Yes, sir. I don't think there's any way to block a multi-ton barge with a plastic kayak.[140]

Similarly, Ms. Spoon testified:

> Q. Were you attempting to deny Bayou Bridge the ability to use the waterway?
>
> A. I don't have the power to do that.
>
> Q. Well, if you parked your canoe in front of where they have to move the barge, wouldn't you prevent by doing that from using the waterway?
>
> A. No. I just don't believe, and I've already said that I don't believe a canoe or a plastic kayak actually prevents a barge, or an air boat, or any other machine, or anything that they have in their hands to use. I don't think we're actually preventing anything like that from happening. I don't think a plastic kayak can block a barge.[141]

When asked why she had not left the canal after her canoe was forced there by the airboats, Ms. Cook-Phillips testified, "The barge being there was still intimidating to try and go around. There were still boats behind them. And then, also, we felt like we were allowed to be there

---

[140] Ex. 49, Moll Dep. 201:2–202:3

[141] Ex. 50, Spoon Dep. 203:9-25.

canoeing and kayaking."[142] She further explained, "I think it became more intimidated when we were getting blown around by the fan boats. I wasn't sure if that was going to be their intention if we tried to move again."[143]

Because a jury could reasonably find that, on the facts known to the arresting officers, any difficulty in moving on the waterway was caused by P&P Defendants and the airboat operators, not the Plaintiffs, BBP's "alternative probable cause" argument is not grounds for summary judgment.

### C. Genuine issues of material fact exist regarding the causation element of Plaintiffs' retaliatory arrest claim.

To prevail on their retaliatory-arrest claim, Plaintiffs must show that (1) they were engaged in constitutionally protected activity, (2) the defendants' actions caused them to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against the plaintiffs' exercise of constitutionally protected conduct.[144]

BBP makes the unsupported statement that Plaintiffs' claims for retaliatory arrest "should be dismissed due to the lack of genuine factual dispute regarding probable cause."[145] But BBP has not made any argument – factual or legal – that probable cause existed to arrest Plaintiffs for Unauthorized Entry of a Critical Infrastructure. Nieves v. Bartlett established that probable cause is not fatal to a retaliatory arrest claim "when a plaintiff presents objective evidence that he was

---

[142] Ex. 51, Cook-Phillips Dep. 191:12-15.

[143] Ex. 5, Cook-Phillips Dep. 193:10-13.

[144] Keenan v. Tejeda, 290 F.3d 252, 258-59 (5th Cir. 2002)

[145] R. Doc. 132-2 at 23.

arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."[146]

In this case, the arresting officers understood that their role was "to keep the protesters from interfering with the work being done,"[147] and had been instructed to "act in the best interest of Bayou Bridge Pipeline, as well as HUB Enterprises, Inc."[148] They followed the Special Detail Post Orders, which pressed for arrests under R.S. 14:61, but which did not even set forth the language of 14:61(A), which defines the prohibited conduct,[149] instead focusing on the addition of "pipelines" to the definition of "critical infrastructure."[150]

Further, they made the arrests at the direction of a "complainant" or "Company Man," in the absence of which the arrests would not have been made.[151] And after the arrests, BBP's Vice President and Senior Director of Security wrote his compatriots that the arrests of the plaintiffs had resulted in many protesters leaving the state for other pipeline sites and a reluctance on the part of other protesters to even come to Louisiana and protest the pipeline.[152] BBP's less-than-a-

---

[146] 139 S. Ct. 1715 (2019); see also id. at 1732 ("To show an arrest violated the First Amendment, everyone agrees a plaintiff must prove the officer would not have arrested him but for his protected speech. And if the only offense for which probable cause to arrest existed was a minor infraction of the sort that wouldn't normally trigger an arrest in the circumstances—if the officer couldn't identify a crime for which probable cause existed until well after the arrest— then causation might be a question for the jury.") (Gorsuch, J., concurring in part and dissenting in part).

[147] Ex. 30, Adams Dep. 45:14-16.

[148] Ex. 29, Dep. Ex. 164 (HUB Special Duty Post Orders).

[149] A. Unauthorized entry of a critical infrastructure is any of the following: (1) The intentional entry by a person without authority into any structure or onto any premises, belonging to another, that constitutes in whole or in part a critical infrastructure that is completely enclosed by any type of physical barrier; (2) The use or attempted use of fraudulent documents for identification purposes to enter a critical infrastructure; (3) Remaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person; (4) The intentional entry into a restricted area of a critical infrastructure which is marked as a restricted or limited access area that is completely enclosed by any type of physical barrier when the person is not authorized to enter that restricted or limited access area.

[150] Dep'n Ex. 164.

[151] Ex. 30, Adams Dep. 67:20 -68:8, 93:1-4; Ex. 37, Matherne Dep. 149:11-14, 149:23-150:1.

[152] Ex. 1, Dep. Ex. 152.

sentence argument about "probable cause" is woefully insufficient to serve as the basis for summary judgment.

BBP otherwise simply incorporates the SMPSO Defendants' argument that Plaintiffs have not created a genuine issue of material fact on the second prong, which the Keenan Court calls "curtailment."[153] The Fifth Circuit has held that, even beyond the objective test of whether the injury would "chill a person of ordinary firmness," plaintiffs must make "some showing that the plaintiff's exercise of free speech has been curtailed."[154]

The Keenan panel was careful to note, however, that "[t]he effect on freedom of speech may be small, but since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." [155] There, the two plaintiffs claimed that a Texas constable for whom they had both worked as reserve deputies retaliated against them for exposing corrupt practices of the office.[156] One plaintiff swore an affidavit that he "backed off from direct involvement in helping expose unlawful practices" after the retaliatory conduct but "videotaped one instance of suspected unlawful activity and filed a complaint with a state agency against Constable Tejeda."[157] The panel concluded that "a required showing of actual injury does not necessarily mean that plaintiffs must cease [the constitutionally protected activity] altogether in order to have a claim for retaliation."[158]

---

[153] R. Doc. 132-2 at 23-24.

[154] McLin v. Ard, 866 F.3d 682, 696 (5th Cir 2017).

[155] Keenan, 290 F.3d at 259, quoting Bart v. Telford, 677 F.2d 622, 625 (7th Cir. 1982).

[156] Keenan, 290 F.3d at 256-57.

[157] Id. at 261.

[158] Id.; see also Perkins v. Hart, 2022 WL 295992 (E.D. La. July 26, 2022) (holding that child's ceasing to video record a sheriff's deputy while he made an arrest, after deputy pointed taser at child, was sufficient evidence of chilled speech).

Each of the Plaintiffs' exercise of speech was curtailed as a result of the arrest. Ms. Spoon changed the way that she participated in the campaign against the Bayou Bridge Pipeline, no longer feeling "comfortable kayaking or canoeing in public waterways to monitor construction or camping on state land nearby construction sites. I would not go out to the swamp anymore unless I knew I was going to private property…Even on private property, I had anxiety about being re-arrested and held in jail because I was out on a felony bond."[159]

Similarly, Mr. Moll "withdrew from protests" after his arrest and did not return to the camp where he had been staying prior to the arrest.[160] Because of his anxiety, he had to find different ways to support the protest, like "focusing on supply runs for groceries, drinking water and logistics."[161] His exercise of speech was affected even apart from actions related to the Bayou Bridge Pipeline:  he experienced "fear and anxiety in the present of police at demonstrations and would opt to stay home or avoid areas of demonstrations where I might be subject to another unlawful arrest."[162]

Ms. Cook-Phillips purposely avoided the camp site for several days following her arrest.[163] Because of her worry of being re-arrested, she avoided any protest activities that would put her near the pipeline construction, security agents, or law enforcement officers.[164] She instead spent her remaining time at the camp doing chores and maintenance.[165]

---

[159] R. Doc. 140-23, Cynthia Spoon Decl. ¶4.

[160] R. Doc. 140-24, Eric Moll Decl. ¶6.

[161] Id.

[162] Id. ¶7.

[163] R. Doc. 140-25, Sophia Cook-Phillips Decl. ¶4.

[164] Id.

[165] Id.

Genuine issues of material fact preclude summary judgment on Plaintiffs' retaliatory arrest claims on the basis raised by BBP.

**D.    Genuine issues of material fact exist on Plaintiffs' supplemental state law claims.**

BBP's argument for summary judgment on Plaintiffs' supplemental state law claims is based on its arguments against their Fourth Amendment claim.[166] Because BBP is not entitled to summary judgment on the Fourth Amendment claim, its argument regarding the state law claims is without merit.

**E.    Plaintiffs do not assert their failure-to-intervene and failure to be advised of the grounds for their arrest against BBP.**

Finally, BBP argues that it cannot be found liable either for the failure of P&P Defendants and SMPSO Defendants to intervene to prevent or stop the unconstitutional seizure of the Plaintiffs[167] or their failure to advise Plaintiffs on the grounds for their arrest.[168] Plaintiffs withdraw any assertion of these claims against BBP.

**V.  CONCLUSION**

BBP was no hands-off customer of security services; rather, it played a continuing, significant role in the scheme which resulted in Plaintiffs' felony arrests which hung over their heads for three years. BBP's purpose was to discourage Plaintiffs and others from protesting their pipeline construction on public land. BBP's motion for summary judgment should be denied.

---

[166] R. Doc. 132-2 at 23 ("Plaintiffs Cannot Maintain False Detention and Imprisonment Claims, Since They are Legally Synonymous with Plaintiffs' False Arrest Claim").

[167] R. Doc. 132-2 at 23.

[168] Id. at 24.

Respectfully submitted,

/s/ James W. Craig
James W. Craig, La. Bar No. 33687
Emily M. Washington, La. Bar No. 34143
Eric A. Foley, La. Bar No. 34199

Roderick & Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
(504) 620-2259 (p)/(504) 208-3133 (f)

jim.craig@macarthurjustice.org
emily.washington@macarthurjustice.org
eric.foley@macarthurjustice.org

*Attorneys for Plaintiffs*