**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF LOUISIANA**


CYNTHIA SPOON, ET AL.                                      CIVIL ACTION


VERSUS                                                     19-516-SDD-SDJ


BAYOU BRIDGE PIPELINE, LLC, ET AL.

<u>**RULING**</u>

This matter is before the Court on the *Motions for Summary Judgment* filed by Defendants St. Martin Parish Sheriff Ronald Theriot, Deputy Sharay Arabie, Deputy Stacey Blanchard, Deputy Troy Dupuis, Deputy Gabe Gauthier, Deputy Waversun Guidry, Deputy Norris Huval, and Deputy Chris Martin ("SMPSO Defendants");[1] Defendant HUB Enterprises ("HUB");[2] and Louisiana Department of Public Safety and Corrections Division of Probation and Parole ("P&P") Defendants Heather Pennington, Herman Matherne, Jon Barbera, Mark Ward, Angela Adams, and Douglas Black ("P&P Defendants).[3] Plaintiffs Cynthia Spoon ("Spoon"), Sophia Cook-Phillips ("Cook-Phillips"), and Eric Moll ("Moll") (or collectively, "Plaintiffs") filed an *Opposition*[4] to each motion, and all Defendants filed *Replies*.[5] The Court previously granted the Defendants' *Motions* for written reasons to be assigned;[6] the Court's reasons are assigned below.

---

[1] Rec. Doc. 89.
[2] Rec. Doc. 101.
[3] Rec. Doc. 129.
[4] Rec. Docs. 140, 137, & 172, respectively.
[5] Rec. Docs. 152, 153, & 182, respectively.
[6] Rec. Doc. 202.

I.      **FACTUAL BACKGROUND**[7]

Since the inception of the permitting process by the United States Army Corps of Engineers, the construction of the Bayou Bridge Pipeline ("the Pipeline") across the Atchafalaya Basin in Louisiana has been hotly contested by various environmental groups, Basin-dependent businesses, indigenous groups, and citizens.[8] Protests began during the permitting process and persisted after the Pipeline became operational. Currently, the Pipeline transports oil from Nederland, Texas to St. James Parish, Louisiana.[9]

In August 2018, Plaintiffs joined activists and water protectors in the L'eau Est La Vie ("Water is Life") camp in St. Martin Parish, Louisiana to protest the construction of the Bayou Bridge Pipeline.[10] On August 9, 2018, Plaintiffs and a journalist, Karen Savage ("Savage"), paddled small boats to the Pipeline construction site in the Atchafalaya Basin to protest the construction.[11] Plaintiffs were ultimately arrested by off-duty Probation and Parole Officers (P&P) who had been contracted to provide security for the construction.[12] This lawsuit arises out of those arrests.

---

[7] There are three distinct Defendants in this case that have moved for summary judgment. Per M.D. La. Civ. R. 56(b), (c), & (d), each Defendant and Plaintiffs have submitted statements of undisputed material facts, opposing statements, and replies.  Given the sheer number of facts listed in each of these documents, the Court has omitted in its background section those facts which are redundant or unnecessary.
[8] *See generally, Atchafalaya Basinkeeper, et al. v. U.S. Army Corps of Engineers*, No. 18-cv-23 (M.D. La.).
[9] Rec. Doc. 158-8, Farber Depo, p. 33:5–13.
[10] Rec. Doc. 54, p. 1.
[11] Rec. Doc. 28, ¶¶ 35–36.
[12] *Id.* at ¶¶ 42–47.

Plaintiffs contend that Bayou Bridge Pipeline, LLC ("BBP"),[13] HUB, the P&P Defendants, and the SMPSO Defendants acted in concert and pursuant to a "preconceived plan" to arrest citizens protesting the Pipeline in violation of their First Amendment Free Speech rights. Essentially, Plaintiffs argue that probable cause to arrest Pipeline protesters was manufactured by BBP and its subcontractors by co-opting legislative and law enforcement processes to serve BBP's interests and chill the free speech of protesters. Plaintiffs filed this lawsuit against all Defendants and asserted the following claims:

Count I - False Detention, Arrest, and Imprisonment in Violation of the Fourth and Fourteenth Amendments; (all Defendants)

Count II - Failure to Intervene to Prevent Unlawful Arrests; (P&P and SMPSO individual Defendants)

Count III - Retaliatory Arrest for Violation of First Amendment Rights; (all Defendants)

Count IV - *Monell* Liability for Violations of Plaintiffs' Civil Rights (Sheriff Theriot/SMPSO)

Count V - Violations of the Free Expression Protections of the Louisiana Constitution; (all Defendants)

Count VI - Violations of the Right to Privacy, the Right to be Left Alone, and the Rights of the Accused Established by the Louisiana Constitution; (all Defendants)

Count VII - Intentional Torts, Including Intentional Infliction of Emotional Distress, Assault, Battery, and False Imprisonment.[14] (all Defendants, generally)

All Defendants moved for summary judgment on these claims.

---

[13] Although BBP is no longer a party to this action, *see* Rec. Doc. 200, it filed a *Motion for Summary Judgment* prior to resolving this matter with the Plaintiffs. Rec. Doc. 132.  The Court may reference record evidence connected to BBP's *Motion* under Rule 56(c)(3) of the Federal Rules of Civil Procedure, which provides: "The court need consider only the cited materials, but it may consider other materials in the record."

[14] Rec. Doc. 28.

### A. Pipeline Security

The following facts are established by record evidence.

BBP is a subsidiary of Energy Transfer Partners ("ETP") and Phillips 66 Partners that was created to build and operate the Bayou Bridge Pipeline.[15] Russell Sweeney ("Sweeney") was a Vice President and Senior Director of Security of ETP,[16] who had "strategic responsibility for physical security" at all ETP facilities and construction sites.[17] Sweeney was tasked with developing a security plan for the construction of the Bayou Bridge Pipeline.[18] Rodney Winch ("Winch"), ETP's Project Security Manager, was assigned "to oversee the management of physical security for the construction project."[19] Winch reported directly to Sweeney.[20]

BBP contracted with Hillard Heinze, a Chicago, Illinois risk management firm, to provide security services for the Pipeline construction project.[21] With BBP's approval, Hillard Heinze engaged HUB to provide security for the pipeline construction project in the Atchafalaya Basin.[22]

Sweeney, Winch, BBP Project Manager Cary Farber ("Farber"), Hillard Heinze onsite Security Project Manager Eddie Langlinais ("Langlinais"), Hillard Heinze employee Steve Monachello ("Monachello"), and Hillard Heinze executive Nathan Hunt ("Hunt")

---

[15] Rec. Doc. 28, ¶ 7.
[16] Rec. Doc. 159-3, Sweeney Depo, p. 15:20–22.
[17] *Id*. at p. 20:13–21.
[18] *Id*. at p. 29:13–23.
[19] Rec. Doc. 159-4, Winch Depo, p. 28:20–25.
[20] Rec. Doc. 159-3, Sweeney Depo, p. 22:3–8.
[21] Rec. Doc. 133-4 (SEALED).
[22] Rec. Doc. 159-3, Sweeney Depo, p. 57:5–12; Rec. Doc. 132-16, HUB Depo, pp. 33:5–14, 36:11–17, 39:11–16, 41:13–42:1; Rec. Doc. 132-7, Farber Depo, pp. 53:14–54:3, 67:12–25.

participated in weekly security briefings for the Pipeline construction.[23] Reports from the field were circulated for the briefings, and they included specific descriptions of security incidents at the Pipeline construction site.[24] One specific matter discussed in the weekly security briefings was the progress of HB 727, proposed legislation to amend La. R.S. 14:61 to upgrade the misdemeanor "Unauthorized Entry to a Critical Infrastructure" to a felony offense.[25] BBP had engaged a lobbyist to solicit support for the amendment to La. R.S. 14:61.[26]

Winch created a document entitled "Atchafalaya Basin Site Security Plan" and submitted it to Sweeney on June 15, 2018.[27] The purpose and scope of the Security Plan is in dispute. BBP maintains that that the Site Security Plan was always a draft, was never finalized, and was never used.[28] ETP maintains that, "the purpose of [the Site Security Plan] [was] to look to see what we've done previously, what we're doing on like projects, and what we're doing on the Bayou Bridge project, and create a document that we could use as a template going forward with other like projects."[29] The Plaintiffs argue that, the

---

[23] Rec. Doc. 159-3, Sweeney Depo, pp. 70:24–71:19; Rec. Doc. 159-4, Winch Depo, pp. 31:21–25, 32:4–11.
[24] *See, e.g.*, Rec. Doc. 7, 8, Depo Exs. 75, 79, respectively; *see also* Rec. Doc. 159-30, Depo Ex. 74; Rec. Doc. 159-31, Depo Ex. 76; Rec. Doc. 159-32, Depo Ex. 77; Rec. Doc. 159-33, Depo Ex., 78. For example, at 12:53 p.m. on April 18, 2018, Langlinais emailed Sweeney and Winch, along with two Hillard Heinze executives, regarding arrests of protesters in Vermillion Parish; Langlinais directed his communication specifically to "Russ." Rec. Doc. 159-31, Depo Ex. 76. Sweeney immediately wrote Langlinais directly asking, "Eddie, Any images you can send me of the people on the ROW?" Rec. Doc. 159-32, Depo Ex. 77.
[25] Rec. Doc. 159-7, Depo Ex. 75; Rec. Doc. 159-8, Depo Ex. 79.
[26] Rec. Doc. 159-9, Depo Ex. 153.
[27] Rec. Doc. 174-2, Depo Ex. 82 (SEALED).
[28] Rec. Doc. 189-3, pp. 92:9–21, 140:8–42:23. BBP argued that, although it was never used, the document's stated purpose "is to identify the security measures that will be in place for the Atchafalaya Basin construction areas." Rec. Doc. 174-6, p. 1 (BBP-408 – BBP-421) (SEALED). The document references "protests, equipment vandalism, or credible threats, etc." *Id.* BBP claimed the language of the document does not reference any "requirements" that HUB submit post orders for the detail. Rec. Doc. 174-6, p. 3 (BBP-408 – BBP-421) (SEALED).
[29] Rec. Doc. 161-2, Sweeney Depo, pp. 96:21–97:2 (SEALED).

"final form" of the Site Security Plan[30] calls for identifying security measures for the Pipeline construction areas in the Atchafalaya Basin, with specific reference to protests, among other possible threats.[31] Plaintiffs claim the Site Security Plan is evidence that BBP and ETP directed and controlled law enforcement. Plaintiffs cite to provisions of the plan which call for HUB to submit security post orders to Hillard Heinze and then to Winch, ETP's Project Security Manager, for review and approval. Under the plan, HUB's security supervisor is expressly directed to report to the ETP Project Security Manager.[32] The Plaintiffs contend that the Security Plan is evidence that, through HUB, ETP and BBP exercised operational control over law enforcement officers from P&P and the St. Martin Parish Sheriff's Office ("SMPSO") to have protesters arrested.[33] The Court finds this factual dispute immaterial because, for the reasons that follow, the Court finds that the law enforcement defendants had actual probable cause to arrest Plaintiffs.

The record reveals that in late July 2018, security was increased at the Pipeline construction site. Hillard Heintze submitted a proposal that contemplated the "use of unarmed, local security guard personnel."[34] Initially HUB employed uniformed, private security officers who were not P.O.S.T. certified[35] and lacked official authority to make arrests.[36] Hillard Heintze advised Sweeney, "based on the current and projected protestor activity, there will be an increase of LEOs [law enforcement officers] and reduction of

---

[30] *Compare* Rec. Doc. 174-4, Depo Ex. 83 (SEALED), Rec. Doc. 174-5, Depo Ex. 85 ("DRAFT") (SEALED) *with* Rec. Doc. 174-6, Depo Ex. 124 ("CONFIDENTIAL") (SEALED). Unlike previous iterations, the watermark "DRAFT" is deleted and replaced with "CONFIDENTIAL."
[31] Rec. Doc. 174-6, Depo Ex. 124 at 1 (SEALED).
[32] *Id.* at 3.
[33] Rec. Doc. 173-1, p. 15.
[34] Rec. Doc. 174-7, Depo Ex. 122 (SEALED).
[35] P.O.S.T. certified means certified by the Peace Officer Standards and Training Council.
[36] Rec. Doc. 190-3, Regan Depo, pp. 51:21–53:4 (SEALED).

guards in August and September. . . ."[37] In late July 2018, HUB contracted with the SMPSO and officers of the Louisiana Department of Public Safety and Corrections Division of Probation and Parole (P&P) to provide security officers with law enforcement powers—including the authority to make felony arrests—as private duty security detail for the Pipeline.[38] The purpose of the security detail was to provide for protection of equipment and construction workers and to prevent trespassing or vandalism.[39]

The SMPSO's General Order 314 governing Extra-Duty Employment provides that "[o]nly P.O.S.T. certified personnel will be allowed this type of employment since actual or potential use of law enforcement powers should be anticipated."[40] The Sheriff's Extra Duty General Order permits "the use of the St. Martin Parish Sheriff's Office time, facilities, equipment, supplies, uniforms, etc."[41] and specifies that "the employment duties must be essentially the same as those that would be performed if the employee were assigned those duties while on-duty."[42]

On August 1, 2018, BBP's security team was informed that the felony amendments to La. R.S. 14:61 became effective that day.[43] At 1:40 p.m. on August 8, 2018, Brandon Thompson ("Thompson"), a scheduler for P&P, emailed the P&P officers working the detail, advising that their orders had changed:

> You have been very flexible and understanding when it comes to last minute change. You all adjusted extremely well. We appreciate that very much. At the beginning of this detail, we were told not to engage with the opposition. However, as the work increases and the opposition are getting aggressive, the "head guy" would like for us to do a little more. He would like us to be

---

[37] Rec. Doc. 174-9, Depo Ex. 148 (SEALED).
[38] Rec. Doc. 137-13, Guidry Depo, p. 26:1–6; Rec. Doc. 159-11, Depo Ex. 62; Professional Services Agreement between SMPSO and HUB, dated July 27, 2018; Rec. Doc. 130-5, HUB Depo, pp. 50; 58–59.
[39] Rec. Doc. 130-4, Post Orders; Rec. Doc. 130-5, HUB Depo, p. 20:14-20.
[40] Rec. Doc. 159-10, Depo Ex. 111 (Sect. III.B.).
[41] *Id.* at Sect. VI.B, Sect. V.K.
[42] *Id.* at Sect. VI.B.
[43] Rec. Doc. 159-16, Depo Ex. 89.

more proactive in moving the opposition when they are obstructing work. With that being said, if the opposition is obstructing work, please be verbal and attempt to have them moved. If they do not move, then contact the Sheriff's Office and work together in order to have them removed. Also, take pictures and videos at ALL times to submit to HUB WATCH COMMANDER (337-319-9078). If you have any pictures of the opposition as of this date, please submit those pictures ASAP. They are keeping track of all pictures and videos provided in order to identify the individuals. Based on the information provided to me today, the Sheriff's Office requested several warrants based on the activities occurring on the property. Yes, they told us not to do anything before, but like the schedule, things change. I know this will be an easy adjustment for the staff we have working this detail. Once again, thank you for all you do !!!! Additional information to follow!!!!![44]

Minutes later, HUB employee Angela Deere ("Deere") emailed SMPSO and P&P schedulers a document titled "Special Post Orders," directing them to "please see attached post orders, if you have any questions let me know."[45] The attached Special Detail Post Orders directed the SMPSO Deputies and P&P Officers that, "[a]s an Officer during your tour of duty you shall act in the best interest of Bayou Bridge Pipeline, as well as HUB Enterprises, Inc."[46] P&P scheduler Thompson sent the Post Orders he received from Deere to the P&P officers, stating, "Please review the attached documentation from HUB. It has directions and information regarding the detail."[47]

The Post Orders advised the officers of the recent felony amendments to La. R.S. 14:61:

Ensure that unauthorized individuals are not allowed to trespass on the Pipeline right of away (ROW). If individuals are observed trespassing on the ROW officers should verbally command the individuals to leave the ROW. If they refuse to leave the ROW officers are authorized to detain the individuals for trespassing and contact the appropriate sheriff's office to request that a deputy respond to the location to arrest and transport the

---

[44] Rec. Doc. 159-17, Depo Ex. 177.
[45] Rec. Doc. 159-18, Depo Ex. 163.
[46] Rec. Doc. 159-20, Depo Ex. 164.
[47] Rec. Doc. 159-22, Depo Ex. 42.

individual from the scene. A copy of House Bill 727 – ACT No. 692 is attached for reference.[48]

In a separate section titled "Use of Force," the document states "We understand that some scenarios may not be a current criminal act, but can escalate into criminal activity if not recognized and effectively interrupted."[49]

HUB employee, Angela Deere, advised P&P schedulers of anticipated arrests of protesters.[50]

> **Angela Deere DSOC**
>
> Tomorrow: St Martin is going out with 2 deputies and making arrests at the chipper sites. They have several warrants also. When making the arrests they would like 1 P&P officer to ride back with 1 deputy on the boat. The other deputy will stay behind and assist in making any other arrest until they get back.
>
> **Angela Deere DSOC**
>
> Call me if you have any questions[51]

Later that day, P&P scheduler Christy Crochet reported:

> I got this text from one of the officers that was at Pigeon today. They are going to be putting a barge in the middle of a dead-end bayou that cuts across the path. They will be there tomorrow to try and stop it. They need to make sure there's enough people there to deal with them as they are getting in the way and not moving even if we threaten arrest. They didn't move until we surrounded them and two officers got in the water.[52]

Deere responded: "This is why [HUB is] having 2 St Martin Officers out there tomorrow to make arrests,"[53] and she noted that SMPSO would be "doubling their

---

[48] Rec. Doc. 159-20, Depo Ex. 164.
[49] *Id.* at 2.
[50] Rec. Doc. 137-18, p. 2.
[51] *Id.*
[52] *Id.* at 3.
[53] *Id.*

forces tomorrow" and "working to secure a warrant."[54] P&P Defendants testified that they received the Post Order prior to their shift on August 9, 2018.[55]

### B.    The Protest Activity

On the morning of August 9, 2018, Plaintiffs Spoon, Cook-Phillips, and Moll, accompanied by Savage, launched a canoe and kayak into the basin. Spoon, Cook-Phillips and Savage were in a canoe and Moll was in a kayak.[56] Savage, a reporter, video-recorded the events of August 9, 2018, on her phone.[57]

P&P officers Pennington, Matherne, Barbera, Ward, Adams, and Black were working the off-duty security detail in the Basin. The officers were on fan boats at the construction site.[58] Two other airboats can be seen on video pushing a construction barge from a larger canal into a smaller waterway.[59] According to the Plaintiffs, BBP construction workers were attempting to move the barge into a small canal which was in the right of way of the construction site.[60] Plaintiffs paddled their canoe and kayak to the site where the barge was being moved.[61] Spoon, Cook-Phillips, and Moll all paddled their boats in front of the barge, in what Spoon concedes was an attempt to

---

[54] *Id.* at 4.

[55] Rec Doc. 130-8, Adams Depo, p. 57; Rec. Doc. 130-11-, Barbera Depo, pp. 57:18-58:21.

[56] Rec. Doc. 159-40, Spoon Depo, p. 79:4–24; Rec. Doc. 159-42, Cook-Phillips Depo, p. 78:2–4.

[57] Rec. Doc. 173 conventionally filed exhibits: Ex. 53, "Img_1197.mov"; Ex. 54, Img_1198.jpg; Ex. 55, Img_1199.jpg; Ex. 56, Img_1200.mov; Ex. 57, Img_1201.mov; Ex. 58, Img_1202.mov; Ex. 59, IMG_1203.mov; Ex. 60, IMG_1204.mov; Ex. 61, IMG_1205.mov; R. Doc. 140-14, IMG_1206.mov; Ex. 62, IMG_1207.mov; Ex. 63, IMG_1208.mov; R. Doc. 140-15, IMG_1209.mov; Ex. 64, IMG_1210.mov, Ex. 65, IMG_1211.mov; Ex. 66, IMG_1212.mov; Ex. 67, IMG_1213.mov; Ex. 68, IMG_1214.mov; Ex. 69, IMG_1215.mov; Ex. 70, IMG_1215.mov.

[58] P&P Defendants offer no citation, but Plaintiffs admit this fact.

[59] Rec. Doc. 159-42, Cook-Phillips Depo, pp. 78:8–79:8; Conventionally filed exhibits to Rec. Doc. 173: Ex. 56, Img_1200.mov; Ex. 57, Img_1201.mov; Ex. 58, Img_1202.mov; Ex. 59, IMG_1203.mov; Ex. 60, IMG_1204.mov, Ex. 61, IMG_1205.mov.; Rec. Doc. 159-40, Spoon Depo, pp. 83–84; Rec. Doc. 159-38, Moll Depo, p. 93:14–18.

[60] Rec. Doc. 130-2, Spoon Depo, p. 258.

[61] Rec. Doc. 130-1, Cook-Phillips Depo, pp. 70–71; Rec. Doc. 130-2, Spoon Depo, p. 79; Video evidence, *supra* note 57.

block the barge from moving into the small canal.[62] According to the testimony of the P&P Defendants, the Plaintiffs ignored multiple verbal commands to move.[63] Cynthia Spoon admitted that she was certain she was told to move.[64]

The record video depicts what can only be described as a dangerous situation. The barge was moving, four airboats piloted by P&P officers were using fan power to move the barge into the small canal and the protesters away from the barge. Despite the winds from the fan boats, Plaintiffs continued to maneuver their canoe and kayak to the front of the barge. Although Plaintiffs deny that this constitutes "blocking" the barge, Plaintiffs describe the maneuvers as a "standoff."[65] P&P Defendant Barbera testified that verbal commands to move were given to the Plaintiffs for over five minutes without compliance.[66] Plaintiffs testified that they had no intention of moving out of the way of the barge and were attempting to keep the barge from moving.[67]

The Court reviewed all the video evidence and found much of the audio indecipherable due to the noise from the airboats. However, based on the consistent testimony of the officers, the video, and Spoon's admission that she was told to move,[68] the Court finds that the evidence establishes that the Plaintiffs were given verbal commands to move their watercraft away from the barge. In other words, they were forbidden to remain.[69]

---

[62] Rec. Doc. 130-2, Spoon Depo, pp. 258; 260.
[63] Rec. Doc. 130-8, Adams Depo, p. 67; Rec. Doc. 130-9, Black Depo, p. 98; Rec. Doc. 130-10, Pennington, p. 86; Rec. Doc. 130-11, Barbera Depo, pp. 81–82.
[64] Rec. Doc. 130-2, Spoon Depo, p. 273.
[65] Rec. Doc. 130-3, Moll Depo, p. 201; Rec. Doc. 130-2, Spoon Depo, p. 204.
[66] Rec. Doc. 130-11, Barbera Depo, pp.125–27.
[67] Rec. Doc. 130-3, Moll Depo, p. 201. *See also* Rec. Doc. 131-6, still frame photographs from various videos taken by Karen Savage, authenticated in Spoon Depo, pp. 171–96, Cook-Phillips Depo, pp. 164–94, Moll Depo, pp. 167–94.
[68] Rec. Doc. 130-2, Spoon Depo, p. 273.
[69] La. R.S. 14:61.

Although the parties' subjective characterizations of the events differ, the testimony of the Plaintiffs and the P&P Defendants corroborate what is shown on the video. The Plaintiffs characterize these maneuvers as "boxing" them into the smaller waterway. P&P Defendant Matherne testified that:

> [A]s the barge kept moving closer air boats came in and tried to – they turned around. I don't know if they were trying to push the individuals [Spoon and Cook-Phillips] out of the way. I don't know if they were just making it uncomfortable. The back of the boats were blowing air up against the barge.[70]

Matherne confirmed that he meant that the air boats were "turning around and blowing . . . with, like, the fan at the back of the boat."[71] He explained, "they were trying to blow – get the wind and the current to blow the protesters out of the way."[72]

Plaintiffs characterize their activity as using the waterway but deny that they were "blocking" the barge. Moll testified:

> [W]ith the understanding that we actually could not block the barge, and it was really more about us being there, showing our presence, you know, showing that people were out, you know, opposing the project in one way or another. And to demonstrate that we do have right to use the waterways. And Everyone has a right to use public waterways.
>
> Q. Okay. And then just to nail it down again by saying you could not block the barge, you mean that the barge could have pushed you out of the way?
>
> A. Yes, sir. I don't think there's any way to block a multi-ton barge with a plastic kayak.[73]

Spoon testified:

> Q. Were you attempting to deny Bayou Bridge the ability to use the waterway?

---

[70] Rec. Doc. 158-19, Matherne Depo, pp. 84:24–85:5.
[71] *Id.* at p. 88:10-14.
[72] *Id.* at p. 88:21-24.
[73] Rec. Doc. 159-38, Moll Depo, pp. 201:2–02:3.

A. I don't have the power to do that.

. . .

Q. Well, if you parked your canoe in front of where they have to move the barge, wouldn't you prevent by doing that from using the waterway?

A. No. I just don't believe, and I've already said that I don't believe a canoe or a plastic kayak actually prevents a barge, or an air boat, or any other machine, or anything that they have in their hands to use. I don't think we're actually preventing anything like that from happening. I don't think a plastic kayak can block a barge.[74]

Spoon explained that the airboats affected her ability to maneuver the canoe.[75] When Cook-Phillips was asked why she had not left the canal after her canoe was forced there by the airboats, she testified, "The barge being there was still intimidating to try and go around. There were still boats behind them. And then, also, we felt like we were allowed to be there canoeing and kayaking."[76] She further explained, "I think it became more intimidated when we were getting blown around by the fan boats. I wasn't sure if that was going to be their intention if we tried to move again."[77]

Plaintiffs admitted that they were in the Basin on August 9, 2018, to disrupt and/or delay construction of the Pipeline.[78] Spoon testified that they would use kayaks and canoes to disrupt construction of the Pipeline by getting close to the construction

---

[74] Rec. Doc. 159-40, Spoon Depo, p. 203:9–25.
[75] Id. at pp. 208:23–29:1, 209:15–22 ("it looks like I'm struggling there. It looks like all three of us are kind of struggling to go. It looks like we're kind of crashing into each other, honestly. Or it looks like Eric's being blown into us, or something, you know. It looks like our boats could even be touching, or we're crashing. Probably being blown into each other is what I would guess").
[76] Rec. Doc. 159-42, Cook-Phillips Depo, p. 191:12–15.
[77] Id. at p. 193:10–13.
[78] Rec. Doc. 130-1, Cook-Phillips Depo, pp. 57–58; Rec. Doc. 130-2, Spoon Depo, p. 70; Rec. Doc. 130-3, Moll Depo, pp. 53–54.

equipment, creating safety hazards, and requiring the operators shut down the machines.[79]

### C.    The Arrests

Video evidence depicts a fifth airboat arriving on the scene, carrying a man in an orange shirt, black sunglasses, and a black-and-white baseball cap. He gestured to Savage and is heard to say, "If she's on the right of way, I want her arrested,"[80] and "[a]ll three of them three right there are in the right-of-way."[81] Spoon and Moll, still in their boats on the water, responded that they were not in the right of way. The man in orange replied, "That's MY right of way."[82] Then the man in orange turned to the airboat being operated by P&P officers Black and Adams and yelled, "Hey, you need to arrest those three. They're in the right of way. I'm filing charges."[83]

P&P officer Adams described "the man in the orange shirt that was in the video" as a "company man."[84] Adams testified that:

> [T]he company man—who I assume was the company man, I don't know. He's like, arrest them, because it will end up—that was not a navigable waterway, as they kept saying they were in a navigable waterway. Because they had some recent law that passed . . . Our boat was near the canoe, we give them verbal commands, they did not respond, company man says, arrest them, so, that's what we did.[85]

Video evidence shows the Plaintiffs being arrested by P&P officers. Spoon and Cook-Phillips were removed from their canoe, brought aboard an airboat by P&P

---

[79] Rec. Doc. 130-2, Spoon Depo, p. 156–57.
[80] Rec. Doc. 140-14, IMG_1206 at 0:32–:39.
[81] *Id.* at 0:55–1:02.
[82] *Id.* at 0:55–1:02.
[83] *Id.* at 1:04–:11.
[84] Rec. Doc. 158-2, Adams Depo, p. 93:1–4.  Plaintiffs claim that the "man in the orange shirt," was Larry Gordon a BBP inspector, *See* Rec. Doc. 173-1, ¶¶ 55–61.
[85] *Id.* at, pp. 67:20–68:8.

officers Black and Adams, and handcuffed with zip ties.[86] After Spoon and Cook-Phillips were arrested, Moll attempted to leave the area, walking through the water with his kayak.[87] Moll testified that:

> [A] fan boat or maybe two fan boats followed me. One of the HUB employees tackled me on a sandbar and, you know, fastened my hands. And then I was dragged and carried onto the easement after that. And by that point, Cindy and Sophia had already been apprehended and had also already been dragged onto the easement.[88]

HUB denies that it had any employees or representatives at the site on the day of Plaintiffs' arrests.[89] The Court finds that the person Moll referred to as a HUB employee was P&P Defendant Mark Ward.[90] The parties dispute whether the Plaintiffs were in the BBP right of way or in public waters at the time of their apprehensions.

P&P Officer Matherne testified that, "if the complainant wouldn't have formally complained then there would have been no arrest . . . had he have not said – have they had not said they wanted them arrested then, in essence, no, they wouldn't have been arrested."[91] Plaintiffs contend that at the time of their arrests, the arresting officers were unable to tell them what laws they had violated.[92]

---

[86] Rec. Doc. 140-15, "IMG_1209.mov"; Rec. Doc. 184, Ex. 44, IMG_1209 at 0:27–:45 and 1:27–:35; Rec. Doc. 159-40, Spoon Depo, p. 98:1–25; Rec. Doc. 159-42, Cook-Phillips Depo, pp. 78:15–79:16.

[87] Rec. Doc. 184, Ex. 44, IMG_1209 at at 1:27–:49.

[88] Rec. Doc. 158-4, Moll Depo, p. 98:7–13.

[89] Rec. Doc. 103-1, HUB Enterprises, Inc.'s, Answers to Plaintiffs' First Set of Interrogatories, Answer to Interrogatory No. 1; Rec. Doc. 103-2, Spoon Depo, 147:4–21; Rec. Doc. 103-3, Cook-Phillips, 238:20–24; Rec. Doc. 130-3, Moll Depo, 146:15–20.

[90] Rec. Doc. 158-3, Ward Depo, p. 82:5–23.

[91] Rec. Doc. 159-26, Matherne Depo, pp. 149:11–14, 149:23–50:1.

[92] Savage asked them what crime Moll was being charged with. Ward responded, "I'm not sure what the statute is. We'll find out when we get to the landing what the statute is. I don't have all the statutes [inaudible]." Rec. Doc. 184, Ex. 51, IMG_1222 at 0:23–0:45.

SMPSO Defendants Troy Dupuis ("Dupuis") and Gabe Gauthier ("Gauthier") were both working the off-duty detail for HUB on August 9, 2018. [93] They were riding in an airboat when they were flagged down by P&P officers on another boat near the construction site where Plaintiffs were being detained. Deputies Gauthier and Dupuis were tasked to arrange for transportation of Plaintiffs to the St. Martin Parish jail.[94] Deputy Huval, who was working on-duty, provided water transport back to the boat landing.[95] Deputies Arabie and Martin, who were both working on-duty, provided ground transport from the boat landing to the jail.[96] Deputies Blanchard and Guidry were working off-duty security details in other areas of the Pipeline and had no involvement with these arrests.[97] Plaintiffs were taken to the St. Martin Parish jail,[98] and they were all released on bond later that day.[99] None of the SMPSO Defendants were present when the Plaintiffs were arrested.[100]

When asked why the Plaintiffs were taken into custody, Deputy Dupuis testified, "I have no idea. I was not there."[101] When asked if he was informed why Plaintiffs were taken into custody, Dupuis stated, "Basically, they were on the right of way blocking the barge," and that "[o]ne of the Probation officers advised us what they arrested them for."[102] But when asked if he had been told what the Plaintiffs were

---

[93] Rec. Doc. 89-4, Gauthier Affidavit; Rec. Doc. 89-5, Dupuis Affidavit.
[94] Rec. Doc. 28, ¶¶ 51, 53.
[95] Rec. Doc. 89-6, Huval Affidavit.
[96] Rec. Doc. 89-7, Arabie Affidavit; Rec. Doc. 89-8, Martin Affidavit.
[97] Rec. Doc. 89-9, Blanchard Affidavit; Rec. Doc. 89-10, Guidry Affidavit.
[98] Rec. Doc. 28, ¶ 58.
[99] *Id.* at ¶ 62.
[100] *See* Rec. Docs. 89-4 through 89-10; Rec. Doc. 89-11, Spoon Depo, pp. 211:2–21; Rec. Doc. 89-12, Cook-Phillips Depo, pp. 195:23–96:22.
[101] Rec. Doc. 136-6, Dupuis Depo, 97:21–23.
[102] *Id.* at pp. 97:24–98:5.

being charged with, Dupuis answered "No, ma'am. We did not discuss that."[103] Similarly, when asked for the probable cause for the arrests, Dupuis answered, "I do not know. I was not there."[104]

Gauthier testified that, while at the site where the Plaintiffs were initially detained, he was not told the reason for their arrests, nor could he remember if he was told the provision of law that the Plaintiffs had allegedly violated.[105] Gauthier did not remember talking to anyone else present at the detention site about why the Plaintiffs were being detained.[106]

SMPSO Defendant Norris Huval ("Huval") piloted the SMPSO boat that brought Plaintiffs and Dupuis to the Bayou Benoit boat landing after receiving the Plaintiffs from airboats. Huval did not ask the P&P officers for the reason for Plaintiffs' arrests, nor did he hear the P&P officers state the charges under which the Plaintiffs would be booked.[107]

SMPSO Defendant Martin transported Moll and a P&P officer from the Bayou Benoit boat landing to the St. Martin Parish jail on August 9, 2018.[108] Martin had no recollection of any discussion with the P&P officer of what charge Moll would be booked under, nor did he recall any conversation about probable cause for Moll's arrest.[109] SMPSO Defendant Sharay Arabie ("Arabie"), who transported Spoon and Cook-Phillips to the jail, had no memory of the incident, no recollection why Plaintiffs were arrested, and no recollection of receiving paperwork relating to these arrests.

---

[103] *Id*. at p. 98:8–10.
[104] *Id*. at p. 98:11–15.
[105] Rec. Doc. 140-20, Gauthier Depo, pp. 76:23–77:11.
[106] *Id*. at p. 77:12–16.
[107] Rec. Doc. 140-5, Huval Depo, pp. 64:16–18, 63:4–10.
[108] Rec. Doc. 140-3, Martin Depo, pp. 100–02.
[109] *Id*. at p. 104:13–19.

SMPSO Defendant Guidry also had no knowledge of the probable cause for Plaintiffs' arrests.[110]

Moll attested that P&P Defendant Ward used a document on HUB letterhead as a reference while he was completing Moll's arrest affidavit in the car on the way to the St. Martin Parish jail.[111] Plaintiffs' arrests were reported that same day (August 9) from HUB and Hillard Heintze directly to BBP.[112] The District Attorney for the 16th Judicial District formally refused prosecution in a letter to attorney William P. Quigley on June 16, 2021.[113]

### D.     The Parties' Arguments

Plaintiffs argue that BBP and its contractors controlled and directed the events of August 9, 2018, including the actions of off-duty law enforcement officers that culminated in the Plaintiffs' arrest. Plaintiffs argue that there was no probable cause to arrest them, they were not on the BBP right of way, and the actions of August 9, 2018, violated their First Amendment rights. BBP is no longer a Defendant in this matter, and HUB denies that it instructed any P&P officers or SMPSO deputies to arrest Plaintiffs; it further denies that it directed the arrests or advised when an arrest was necessary or proper.[114] The text message evidence offered by Plaintiffs does not contain any instructions or directives from HUB.[115] HUB argues it lacked authority to instruct the P&P officers or SMPSO deputies to make any arrests and had no right to control their actions.[116]

---

[110] Rec. Doc. 140-21, Guidry Depo, pp. 140:15–41:4.
[111] Rec. Doc. 140-24, Declaration of Eric G. Moll. Defendant Ward testified that he began working on the probable cause affidavit when he was in the vehicle traveling to the jail. Rec. Doc. 159-23, Ward Depo at 85:13–20.
[112] Rec. Doc. 159-35, Depo Ex. 90; Rec. Doc. 159-36, Depo Ex. 91.
[113] Rec. Doc. 158-24, 2021.07.08 Final Dismissal Prosecutions DA Duhe.pdf.
[114] Rec. Doc. 103-5, 30(b)(6) Deposition of HUB Enterprises, Inc., 79:8–24, 122:20–23:13, 158:22–59:18.
[115] Rec. Doc. 137-18 at HUB-000102.
[116] Rec. Doc. 103-5, 30(b)(6) Deposition of HUB Enterprises, Inc., 122:20–23:13.

As for the communication from HUB employee, Angela Deere to P&P officers, HUB argues that Deere was merely relaying information; she was not ordering, directing, or instructing officers to make arrests.[117] HUB argues that the Special Detail Post Orders did not "order" any law enforcement officers ("LEO"s) how to conduct their security duties or instruct the LEOs to detain individuals. HUB points to the post orders which specify that: "Officers will use their professional training . . ." and "Officers exercise the authority and responsibility . . . ;" as proof that HUB did not control or attempt to control LEOs.[118] HUB supports its argument citing the testimony of LEOs that HUB did not give them any instructions, did not instruct them to make arrests, and did not control the performance of their security duties.[119]

Finally, HUB contends there is no evidence to suggest that the so-called "company man" worked for HUB or represented HUB in any manner. P&P Defendant Adams testified that she believed the company man (who is also referred to as the man in an orange shirt) was a Pipeline worker, but she would not have arrested Plaintiffs if she didn't think a law was being broken.[120] P&P Defendant Black did not identify the "company man" as having any connection to HUB.[121]

The P&P Defendants deny that they were using the airboats to push Plaintiffs into the canal; rather, they characterize the maneuvers as blowing the protesters out of the way of the barge after they refused to heed commands to move out of the way.[122] The

---

[117] Rec. Doc 137-18 at HUB-000098.
[118] Rec. Doc 137-7, p. 3.
[119] Rec. Doc. 153-2, Guidry Depo, pp. 153–54; Rec. Doc. 153-7, Martin Depo, pp. 145–46; Rec. Doc. 153-8, Barbera Depo, pp. 121, 133; Rec. Doc. 153-9, Ward Depo, pp. 143–146; Rec. Doc. 153-10, Black Depo, pp. 93, 95; Rec. Doc. 153-13, Gauthier Depo, p. 96; Rec. Doc. 153-14, Martin Depo, p. 128.
[120] Rec. Doc. 153-10, Adams Depo, pp. 92, 94–95.
[121] Rec. Doc. 153-11, Black Depo, pp. 135–37.
[122] Rec. Doc. 130-3, Moll Depo, p. 201; Rec. Doc. 130-2, Spoon Depo, pp. 258–60; Rec. Doc. 130-12, Matherne Depo, p. 85.

P&P Defendants contend that, when Plaintiffs positioned themselves in the right of way, the officers moved to arrest them.[123] They assert that even prior to being in the right of way, Plaintiffs were blocking a navigable body of water.[124] According to P&P, the Plaintiffs resisted arrest.[125] They contend that Moll attempted to interfere in the arrest of Spoon and Cook-Phillips,[126] swung his paddle at the officers' fan boats,[127] and upon being advised that he was under arrest, Moll jumped out of his kayak and entered the water to resist.[128]

P&P Officer Adams testified that she would not have arrested Plaintiffs if she did not believe they were breaking the law.[129] Even though Matherne testified that "the company guy" wanted Plaintiffs arrested, he continued that "[i]f the arrest wasn't proper, no I wouldn't have completed it."[130]

The Court does not reach the parties' arguments regarding *Monell* liability as the Court finds, for the reasons which follow, that there was no constitutional violation of Plaintiffs' rights.[131]

### E.    The Harm

The Plaintiffs assert that the security actions which culminated in their arrests chilled their exercise of free speech and caused them emotional distress. Spoon offers that the Defendants' actions caused her to change the way that she participated in the

---

[123] Rec. Doc. 130-9, Black Depo, pp.98–99; Rec. Doc. 130-1, Matherne Depo, pp. 84–85.
[124] Rec. Doc. 130-3, Moll Depo, p. 201. *See also* Rec. Doc. 131-6, still frame photographs from various videos taken by Karen Savage.
[125] Rec. Doc. 131-3 Affidavit of Arrest, Cynthia Spoon; Rec. Doc. 131-4, Affidavit of Arrest, Cook-Phillips; Rec. Doc. 130-9, Black Depo, p. 99.
[126] Rec. Doc. 130-3, Moll Depo, p. 203.
[127] Rec. Doc. 130-11, Barbera Depo, pp. 81–82.
[128] Rec. Doc. 131-2, Ward Depo, p. 81; Rec. Doc. 131-5, Affidavit of Arrest, Eric Moll.
[129] Rec. Doc. 130-8, Adams Depo, pp. 94:25, 95:1–20.
[130] Rec. Doc. 131-1, Matherne Depo, p. 148:24–50:1.
[131] *Monell v. Dep't of Soc. Serv. of the City of N.Y.*, 436 U.S. 658 (1978).

protests against the Pipeline, no longer feeling "comfortable kayaking or canoeing in public waterways to monitor construction or camping on state land nearby construction sites. "I would not go out to the swamp anymore unless I knew I was going to private property. . . . Even on private property, I had anxiety about being re-arrested and held in jail because I was out on a felony bond."[132] Similarly, Moll "withdrew from protests" after his arrest and did not return to the camp where he had been staying prior to the arrest.[133] Because of his anxiety, he had to find different ways to support the protest, like "focusing on supply runs for groceries, drinking water and logistics."[134] His exercise of speech was affected even apart from actions related to the Pipeline; he experienced "fear and anxiety in the presence of police at demonstrations and would opt to stay home or avoid areas of demonstrations where [he] might be subject to another unlawful arrest."[135] Cook-Phillips purposely avoided the camp site for several days following her arrest.[136] Because of her worry of being re-arrested, she avoided any protest activities that would put her near the Pipeline construction, security agents, or law enforcement officers.[137] She instead spent her remaining time at the camp doing chores and maintenance.[138]

P&P Defendants object to any statements offered by Plaintiffs regarding the alleged chilling of their First Amendment rights: "This statement and the Declaration in support is an effort to enlarge the pleadings after the deadline for amendments and the

---

[132] Rec. Doc. 158-25, Spoon Decl. ¶ 4 (Dec. 2, 2022).
[133] Rec. Doc. 158-26, Moll Decl. ¶ 6 (Dec. 2, 2022).
[134] Id.
[135] Id. at ¶ 7.
[136] Rec. Doc. 158-27, Cook-Phillips Decl. ¶ 4 (Dec. 2, 2022).
[137] Id.
[138] Id.

close of discovery. Plaintiffs did not plead any facts or conclusions about the effect of the arrests on their protest activity. Plaintiffs' Ex. 29 should be stricken."[139]

Regarding Plaintiffs' IIED claims, P&P Defendants point out that Spoon did not seek any mental health treatment following her arrest.[140] Moll did not receive any treatment for alleged emotional distress.[141] Cook-Phillips did not seek any treatment for alleged mental distress until nearly two years after her arrest. She was diagnosed with depression but has no opinion from any doctor as to the cause of the depression, or that it is in any way related to the arrest.[142] Further, Cook-Phillips treated with therapists and had trouble sleeping prior to the arrests.[143]

## II.    LAW AND ANALYSIS

### A.  Summary Judgment Standard

A court should grant a motion for summary judgment when the movant shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[144] The party moving for summary judgment is initially responsible for identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact.[145] A court must deny the motion for summary judgment if the movant fails to meet this burden.[146]

If the movant makes this showing, however, the burden then shifts to the non-moving party to "set forth specific facts showing that there is a genuine issue for trial."[147]

---

[139] Rec. Doc. 182-1, p. 9.
[140] Rec. Doc. 130-2, Spoon Depo, p. 251.
[141] Rec. Doc. 130-3, Moll Depo, p. 114:10–15.
[142] Rec. Doc. 130-1, Cook-Phillips Depo, p. 98.
[143] *Id.* at pp. 88–89.
[144] Fed. R. Civ. P. 56.
[145] *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995).
[146] *Id.*
[147] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (quotations omitted).

This requires more than mere allegations or denials of the adverse party's pleadings. Instead, the nonmovant must submit "significant probative evidence" in support of his claim.[148] "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted."[149]

A court may not make credibility determinations or weigh the evidence in ruling on a motion for summary judgment.[150] The court is also required to view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.[151] Under this standard, a genuine issue of material fact exists if a reasonable trier of fact could render a verdict for the nonmoving party.[152]

### B. Probable Cause/Qualified Immunity

The P&P Defendants argue that actual probable cause existed to arrest Plaintiffs on August 9, 2018; alternatively, they argue that they are entitled to qualified immunity because there was arguable probable cause to arrest Plaintiffs. P&P Defendants contend the undisputed evidence demonstrates that they were objectively reasonable in arresting Plaintiffs for trespassing on critical infrastructure, obstructing a navigable waterway, and resisting arrest - all violations of Louisiana law.

The Fourth Amendment to the Constitution guarantees "the right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . and [that] no warrants shall issue, but upon probable cause."[153] A constitutional claim for false arrest

---

[148] *State Farm Life Ins. Co. v. Gutterman*, 896 F.2d 116, 118 (5th Cir. 1990) (citing *In re Mun. Bond Rep. Antitrust Litig.*, 672 F.2d 436, 440 (5th Cir. 1982)).
[149] *Anderson*, 477 U.S. at 249 (citations omitted).
[150] *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).
[151] *Clift v. Clift*, 210 F.3d 268, 270 (5th Cir. 2000).
[152] *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008).
[153] U.S. Const. amend. IV.

"requires a showing of no probable cause."[154] Probable cause is established by "facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense."[155] "Probable cause does not demand that an officer's good-faith belief that a suspect has committed or is committing a crime be 'correct or more likely true than false.'"[156] Rather, "it requires only facts sufficient to establish the sort 'of "fair probability" on which "reasonable and prudent [people,] not legal technicians, act."'"[157]

"Qualified immunity protects government officials from civil liability in their individual capacity to the extent that their conduct does not violate clearly established statutory or constitutional rights."[158] "A plaintiff seeking to overcome qualified immunity must show: '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.'"[159] Once qualified immunity is raised, "the burden shifts to the plaintiff to demonstrate the inapplicability of the defense."[160]

The Fifth Circuit has explained:

> In the false arrest context, qualified immunity will apply "if a reasonable officer could have concluded that there was probable cause upon the facts then available to him." *Brown v. Lyford*, 243 F.3d 185, 190 (5th Cir. 2001); *see Club Retro*, 568 F.3d at 204 . . . Actual probable cause is not necessary; merely *arguable* probable cause is sufficient to trigger qualified immunity. *Club Retro*, 568 F.3d at 207 ("[P]laintiffs must allege facts permitting an

---

[154] *Club Retro, L.L.C. v. Hilton*, 568 F.3d 181, 204 (5th Cir. 2009).
[155] *Id.* (quoting *Piazza v. Mayne*, 217 F.3d 239, 245–46 (5th Cir. 2000)).
[156] *Zalaski v. City of Hartford*, 723 F.3d 382, 389–90 (2d Cir. 2013) (quoting *Texas v. Brown*, 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983)).
[157] *Id.* at (quoting *Florida v. Harris*, 133 S.Ct. at 1055 (alteration in original) (quoting *Illinois v. Gates*, 462 U.S. at 231, 238, 103 S.Ct. 2317))).
[158] *Cass v. City of Abilene*, 814 F.3d 721, 728 (5th Cir. 2016) (per curiam).
[159] *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011)).
[160] *Club Retro*, 568 F.3d at 194.

inference that defendants lacked arguable (that is, reasonable but mistaken) probable cause for the arrests."); *see also D.C. v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 591, 199 L.Ed.2d 453 (2018). Defeating qualified immunity is thus "a significant hurdle." *Brown*, 243 F.3d at 190.[161]

1. Probable Cause

By their testimony, Plaintiffs admit that their objective for being in the waterway on August 9 was to obstruct construction of the Pipeline. Plaintiffs were arrested pursuant to La. R.S. 14:61. The constitutionality, facially and as applied, of La. R.S. 14:61 was challenged on First Amendment grounds in *Hat v. Landry*.[162] Denying the plaintiff's Motion for Summary Judgment in that case, the Court for Western District of Louisiana found that La. R.S. 14:61 was constitutional.[163]

La. R.S.14:61 provides:

A.  Unauthorized entry of a critical infrastructure is any of the following:

. . .

(3) Remaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person.

B. For the purposes of this Section, the following words shall have the following meanings:

(1) "Critical infrastructure" means any and all structures, equipment, or other immovable or movable property located within or upon chemical manufacturing facilities, refineries, electrical power generating facilities, electrical transmission substations and distribution substations, water intake structures and water treatment facilities, natural gas transmission compressor stations, liquified natural gas (LNG) terminals and storage facilities, natural gas and hydrocarbon storage facilities, transportation facilities, such as ports, railroad switching yards, *pipelines*, and trucking terminals, *or any site*

---

[161] *Petersen v. Johnson*, 57 F.4th 225, 232 (5th Cir. 2023) (original emphasis).
[162] *Hat v. Landry*, No. 6:20-CV-00983, 2023 WL 3854717 (W.D. La. June 5, 2023).
[163] *Id.*

*where the construction or improvement of any facility or structure referenced in this Section is occurring.*

. . .

(3) "Pipeline" means flow, transmission, distribution, or gathering lines, regardless of size or length, which transmit or transport oil, gas, petrochemicals, minerals, or water in a solid, liquid, or gaseous state.

. . .

D. Nothing in this Section shall be construed to apply to or prevent the following:

(1) Lawful assembly and peaceful and orderly petition, picketing, or demonstration for the redress of grievances or to express ideas or views regarding legitimate matters of public interest, including but not limited to any labor dispute between any employer and its employee or position protected by the United States Constitution or the Constitution of Louisiana.

(2) Lawful commercial or recreational activities conducted in the open or unconfined areas around a Pipeline, including but not limited to fishing, hunting, boating, and birdwatching.

P&P Defendants also claim that probable cause for Plaintiffs' arrest existed under La.

R.S. 14:96 and La. R.S. 14:97, which provide, respectively:

A. Aggravated obstruction of a highway of commerce is the intentional or criminally negligent placing of anything or performance of any act on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, wherein it is foreseeable that human life might be endangered.

. . .

A. Simple obstruction of a highway of commerce is the intentional or criminally negligent placing of anything or performance of any act on any railway, railroad, navigable waterway, road, highway, thoroughfare, or runway of an airport, which will render movement thereon more difficult.

B. Whoever commits the crime of simple obstruction of a highway of commerce shall be fined not more than two hundred dollars, or imprisoned for not more than six months, or both.

P&P Officer Ward testified that he repeatedly told Moll to move away from the barge, but Moll continued to place his kayak in the path of the barge such that "it would've had to run over [Moll] to get where it was trying to get to."[164] Ward's testimony is undisputed, and Moll himself testified that he was attempting to block movement of the barge by positioning himself in the waterway.[165]

Likewise, P&P Defendants testified that they observed Spoon in a canoe in front of the barge, asked her to move several times, and she refused.[166] Instead, Spoon positioned her canoe directly in front of the barge to block it from turning from the larger waterway into the small channel.[167] Spoon's testimony confirms that of the P&P officers. Spoon testified that she was sure she was told to move out of the way.[168] She purposefully made no effort to move into open water next to the barge; she admitted she was directly in front of the barge the entire time it attempted to turn; and she admitted that the purpose of her conduct was to attempt to slow down Pipeline construction.[169] Spoon claimed the airboats caused her to lose control of her canoe,[170] but she was able to maintain her canoe in front of the barge.[171] This was also true as to Cook-Phillips, who was repeatedly asked to move her canoe[172] from in front of the barge, but she refused.[173] Cook-Phillips was in the same canoe as Spoon, but she had her own paddle and was actively moving

---

[164] Rec. Doc. 132-20, Ward Depo, pp. 83:24–86:9, 87:5–10, 87:22–24, 91:24–92:18, and Exhibit 5 to Depo.
[165] Rec. Doc. 132-23, Moll Depo, pp. 200:14–01:22. Moll also testified the location of the bayou and canal where he was arrested were public, navigable waterways. *Id.* at pp. 198:1–3, 225:21–24.
[166] Rec. Doc. 132-18, Adams Depo, pp. 67:5–68:2; Rec. Doc. 132-19, Black Depo, pp. 97:10–99:18; Rec. Doc. 132-24, Matherne Depo, pp. 83:20–88:1.
[167] *Id.* at pp. 96:18–97:14; 98:14–99:2.
[168] Rec. Doc. 132-21, Spoon Depo, p. 273:7–12. Spoon also testified the location of the waterway where she was arrested was a public, navigable waterway. *Id.* at p. 257:2–14.
[169] *Id.* at pp. 204:11–05:6, 259:5–60:4, 178:20–79:11.
[170] *Id.* at pp. 198:20–99:10.
[171] *Id.* at pp. 197:22–200:1.
[172] Cook-Phillips was in the same canoe at Spoon.  Rec. Doc. 132-22, Cook-Phillips Depo, p. 229:1–11.
[173] Rec. Doc. 132-18, Adams Depo, pp. 67:5–68:2; Rec. Doc. 132-19, Black Depo, pp. 97:10–99:18; Rec. Doc. 132-24, Matherne Depo, pp. 83:20–88:1.

the canoe along with Spoon. Cook-Phillips admitted that she paddled up to the barge and that sitting still in front of the barge was part of her protest.[174] She further testified she did not believe she had to move for any reason.[175]

Plaintiffs argue there are genuine issues of material fact regarding the issue of whether the P&P officers had probable cause to arrest Plaintiffs. Plaintiffs cite jurisprudence supporting the proposition that summary judgment on false arrest claims should be denied when the facts relating to probable cause are in dispute, even where qualified immunity has been asserted.[176] Plaintiffs also maintain that the P&P Defendants never pled as an affirmative defense that probable cause existed under La. R.S. 14:96 and 14:97; thus, any argument that probable cause was present under these statutes, rather than La. R.S. 14:61, is waived.

Plaintiffs argue their conduct fell within La. R.S. 14:61(D), which makes clear that the "lawful assembly and peaceful and orderly petition" along with "recreational activities conducted in the open or unconfined areas around a pipeline, including but not limited to fishing," are not violations of law.[177] Plaintiffs rely upon the video footage submitted in this matter which they maintain "depicts the peaceful nature of Plaintiffs' protest and their use of the waterways as any recreational boater would."[178] Plaintiffs claim their conduct did not fall under any subsection of La. R.S. 14:61(A), which sets forth prohibited conduct. Plaintiffs contend that whether their conduct met the exception or was illegal conduct is a question of fact for the jury.

---

[174] Rec. Doc. 132-22, Cook-Phillips Depo, pp. 170:6–13, 192:22–24.
[175] *Id.* at p. 201:5–23.
[176] Rec. Doc. 172, p. 15, n. 79.
[177] La. R.S. 14:61(D)(1)–(2).
[178] Rec. Doc. 172, p. 16.

Defendants claim Plaintiffs violated La. R.S. 14:61(A)(3): "Remaining upon or in the premises of a critical infrastructure after having been forbidden to do so, either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person." Plaintiffs argue their conduct did not violate subsection (A)(3) because: (1) they were not in the premises of a critical infrastructure but, rather, were in the public space of a navigable waterway; and (2) there is no evidence that they had been "forbidden" to be in the water "either orally or in writing, by any owner, lessee, or custodian of the property or by any other authorized person."[179]

Plaintiffs acknowledge that qualified immunity is an available defense when probable cause for a different charge than the one stated for the arrest is present. However, Plaintiffs protest Defendants' attempt to argue probable cause under La. R.S. 14:96 and 14:97, claiming that because Defendants never pled this defense, it is waived. Plaintiffs argue that this defense requires additional facts to be pled in a responsive pleading or at least in time for Plaintiffs to take discovery; they claim prejudice on their belief that this alternative basis for probable cause was raised for the first time in Defendants' summary judgment motions, months after the deadline for amending pleadings or taking discovery.

Alternatively, if not waived, Plaintiffs maintain that the P&P officers lacked probable cause to arrest them for aggravated obstruction of a navigable waterway because "it is not reasonably foreseeable that paddling a canoe or a kayak in a large Pipeline canal would endanger human life."[180] Rather, Plaintiffs argue that "[t]he conduct of the airboat drivers that Plaintiffs encountered, however, would foreseeably endanger life," and they

---

[179] *Id.* at p. 17.
[180] *Id.* at p. 19. Plaintiffs cite no authority for this legal conclusion.

claim the video evidence supports their testimony that "multiple airboats circled Plaintiffs, pointing their fans at their canoe and kayak and revving their engines, blowing Plaintiffs vessels around the waterway."[181]

As to simple obstruction, which prohibits the "intentional or criminally negligent … performance of any act on . . . a navigable waterway which will render movement thereon more difficult,"[182] Plaintiffs claim "[s]cant caselaw exists interpreting this law's application to navigable waterways."[183] Plaintiffs maintain that, according to the video and deposition testimony, "it was the action of the air boats that blew the canoe into the smaller channel."[184] Plaintiffs further claim that they were not in the larger waterway which would be used for transportation, but in a smaller side waterway, and the video evidence demonstrates the airboats carrying P&P Defendants freely moving from the Pipeline Canal into the smaller waterway to seize Plaintiffs.[185] Plaintiffs posit that, because "none of the facts known and expressed by the P&P Defendants" support the idea that the barge or any other vessel was obstructed from navigating the waterway because of Plaintiffs' canoe and kayak, there was no probable cause to arrest Plaintiffs under this statute.[186]

Regarding Plaintiffs' state constitutional challenge to the arrests, Plaintiffs concede that the right to know the ultimate charge is not guaranteed at the time of arrest and that

---

[181] *Id.*
[182] La. R.S. 14:97(A).
[183] Rec. Doc. 172, p. 19. Plaintiffs liken this statute to Title 33, Section 162.75 of the Code of Federal Regulations, which similarly provides: "A clear channel shall at all times be left open to permit free and unobstructed navigation by all types of vessels and tows using the various waterways covered by the regulations in this section." *Id.* at p. 20. Plaintiffs cite Eleventh Circuit jurisprudence interpreting this CFR: "'an obstruction to navigation is to be determined by reference to all the relevant facts and circumstances, including the percentage of the waterway's width that is obstructed.'" *Id.* (quoting *Orange Beach Water, Sewer, and Fire Protection Authority v. M/V Alva*, 680 F.2d 1374, 1380 (11th Cir. 1982)).
[184] *Id.* at p. 20.
[185] *Id. See, e.g.*, Rec. Doc. 184, Ex. 42, IMG_1207.
[186] *Id.*

the language of Louisiana Constitution Article I § 13 instead speaks of the right to "be advised fully of the reason for [their] arrest or detention."[187] However, Plaintiffs maintain that the facts alleged in their *First Amended Complaint* sufficiently present a violation of the Constitutional article and its companion statute in the Code of Criminal Procedure, art. 218, which provides: "A peace officer, when making an arrest without a warrant, shall inform the person to be arrested of his intention to arrest him, of his authority, and of the cause of the arrest."[188] But article 218 does not stop there:

> A peace officer, when making an arrest without a warrant, shall inform the person to be arrested of his intention to arrest him, of his authority, and of the cause of the arrest. A private person, when making an arrest, shall inform the person to be arrested of his intention to arrest him and of the cause of the arrest.
>
> The officer or private person making the arrest **need not so inform the person to be arrested if the person is then engaged in the commission of an offense, or is pursued immediately after its commission** or after an escape, or flees or forcibly resists before the officer or person making the arrest has an opportunity to so inform him, or when the giving of the information would imperil the arrest.[189]

Louisiana appellate courts have held that an officer making an arrest for disturbing the peace did not have to specifically inform the defendant that he had violated such provisions of criminal code, since the defendant was then engaged in the commission of the offense.[190]

The Court has considered the applicable law, the arguments of the Parties, and all summary judgment evidence presented in this case, and the Court finds that there was actual probable cause to arrest Plaintiffs on August 9, 2018. The Court spent considerable

---

[187] Rec. Doc. 140, p. 30.
[188] *Id.*
[189] La. Code Crim. Proc. Ann. art. 218 (emphasis added).
[190] *McDaniel v. Green*, 99–1087 (La. Ct. App. 3d Cir. 12/22/99), 755 So.2d 942, *review denied* 00–0200 (La. 3/24/00), 758 So.2d 151.

time reviewing the video evidence submitted by Plaintiffs in connection with their sworn testimony. The Court finds that no reasonable jury could conclude that Plaintiffs were not purposely obstructing the path of the barge in a navigable waterway in violation of Louisiana law.

Viewing all evidence in the light most favorable to Plaintiffs, Plaintiffs have failed to demonstrate a genuinely disputed material fact as to whether they were purposely obstructing a navigable waterway.[191] The Court reviewed the video and still images submitted by Plaintiffs in response to BBP's *Motion*.[192] Exhibit 33 shows the P&P officers in airboats that are pushing the Plaintiffs' canoes away from the barge's path. It is clear that Plaintiffs have ample opportunity to retreat or move away from the barge. Despite having been blown out of the path of the barge, Exhibits 54 and 55 show that Moll placed himself directly in front of the barge, and Spoon and Cook-Phillips are paddling back towards the front of the barge. Exhibit 56 shows the P&P officers positioning the airboat to blow Plaintiffs away from the front of the barge, and Exhibit 57 shows the P&P officers again using their airboats to blow Plaintiffs away from the barge. Spoon and Cook-Phillips immediately paddle right back into position to block the barge. Moll is not seen in Exhibit 57. Exhibit 58 shows that the airboats have moved Spoon and Cook-Phillips out of the way of the barge, and the P&P officers position their airboats to keep Plaintiffs from placing themselves back in front of the barge.

Exhibit 59 shows the barge attempting to get in position to make the turn from the larger waterway to the smaller waterway. As this happens, Spoon and Cook-Phillips

---

[191] A violation of La. R.S. 14:97.
[192] This conventionally filed thumb-drive is docketed as Rec. Doc. 183 and contains Exhibits 33, 52–70. The Court carefully reviewed each of these Exhibits, on multiple occasions.

paddle right back into the direct path to block the barge's turn. Exhibit 60 shows that Moll is behind the barge and out of the way. Another worker in an airboat—the man in the "orange shirt"—attempts to remain close enough to the side of the barge to keep Moll from getting back in front of the barge; however, Moll squeezes through a small opening between the barge and the boat and rejoins Spoon and Cook-Phillips in directly blocking the barge's path. In Exhibit 62, all Plaintiffs are seen directly in front of the barge; no efforts are made to move out of the way. P&P officers are seen motioning officers on the bank for handcuffs or hand ties. Exhibit 63 shows Plaintiffs sitting still in front of the barge, close enough that they make either incidental or intentional contact with the barge with their hands, canoes, and paddles.

Exhibit 64 shows Cook-Phillips handcuffed and inside the P&P airboat while Spoon is screaming, "If you let me go, I'll leave," as the officers attempt to handcuff her and pull her onto the airboat. In Exhibit 66, Spoon and Cook-Phillips are seen in what appear to be hand ties, and they are seated on the P&P airboat. In Exhibit 67, the P&P officers attempt to walk Spoon up onto the bank. Spoon goes limp and states: "I will walk if I'm allowed to ask a question." The P&P officers half drag, half lift Spoon up onto the bank; however, the officers do not appear to engage with Plaintiffs or Savage, who is also asking questions of the officers. In Exhibit 68, as this airboat approaches the bank, the video is taken close enough to observe the uniforms of the P&P officers, which are clearly indicative of law enforcement.[193] At some point, Savage recognizes that these officers

---

[193] Each P&P officer in the video is wearing a short-sleeved black polo shirt with a large gold emblem in the shape of the state of Louisiana on the top right side of the chest. (This is from the vantage point of the viewer). The top of the emblem says "AGENT," the middle of the emblem contains the seal of Louisiana, and the bottom of the emblem reads "PROBATION & PAROLE." Each P&P officer is wearing a gun belt around their waist which includes "a gun, badge, radio, handcuffs." Rec Doc. 130-9, Black Depo, p. 93:23.

are with Probation & Parole as she states to them that she has a list of Probation & Parole officers assigned to this project and she wants their names. One P&P officer responds that she should call the Probation & Parole department for information.

Exhibit 68 later shows Moll on an airboat with his hands tied behind him. At one point, Moll is standing in the airboat between two P&P officers who are holding him by each arm. As they attempt to disembark from the airboat, Moll goes limp and refuses to walk. The P&P officers drag/lift Moll up onto the bank where Spoon and Cook-Phillips are being detained.

No reasonable jury could conclude that the video depicts Plaintiffs using the waterway recreationally. Rather, the video depicts Plaintiffs attempting to block the path of the barge despite the many times the P&P officers use their airboats to push the Plaintiffs out of the way. The video evidence does not depict any body language suggesting Plaintiffs are intimidated by the barge or the airboats, as they repeatedly place themselves right back in front of the barge. This evidence does not depict Plaintiffs being forced or "boxed" into the small waterway by the airboats; rather, Plaintiffs have ample opportunity to retreat and move away from the barge and the airboats, and they are in full control of their canoes when they paddle back into the path of the barge. The P&P officers have the unmistakable appearance of law enforcement, and the Plaintiffs were in close enough proximity to the officers to observe their shirt emblems, badges, and gun belts before they were arrested.[194]

---

On the front of the gun belt is a gold metal badge in the shape of the state of Louisiana. Any words on the badge are undecipherable. The gun belts worn by the P&P officers contain firearms and other tools of law enforcement.

[194] This video evidence undermines Spoon's testimony that the P&P officers would not identify themselves and she had no reason to believe they were law enforcement "because they weren't wearing any identifying clothing, or anything like that." Rec. Doc. 89-11, Spoon Depo, p. 95:5–6. She did acknowledge that the P&P officers wore black collared shirts with a state of Louisiana emblem. *Id.* at 95:9–10.

From the video evidence, the Court could not hear any conversation that may, or may not, have taken place between the P&P officers and Plaintiffs before the arrests. The Court was able to hear one or two different construction workers yell at the Plaintiffs and Savage, imploring the officers to arrest the Plaintiffs for being in the right of way and arguing with Savage as one of the men attempted to block her camera with his hand. From the point of Plaintiffs' seizure, Spoon and/or Cook-Phillips can be heard repeatedly referring to the P&P officers as "not cops."

The Court's observations of the video evidence are confirmed by Plaintiffs' sworn testimony. All three Plaintiffs testified that they were in the basin to disrupt or delay the construction of the Pipeline.

> Q:       I understand you're saying one of your goals was to use the public waterway, but that wasn't your sole goal for being in the water if you were in the canoe or whatever boat, kayak. One of your goals was to get close enough so the machines have to be shut down in order to delay or interrupt construction, correct?
>
> Cook-Phillips: Yeah, for me, that was a goal.[195]
>
> . . .
>
> Q:       Okay. So is it correct that one of your goals—or your goals while you were in Louisiana in 2018 were—included not only to spread awareness, and about the Pipeline, and what you perceived to be negative effects of the Pipeline, but also to actively interfere and delay construction; is that correct?
>
> Spoon:   One of my goals is to delay construction. I'd say more like one of my hopes. Yes, I hope that the construction gets delayed and halted.[196]
>
> . . .

---

[195] Rec. Doc. 130-1, Cook-Phillips Depo, pp. 57:19–58:1.
[196] Rec. Doc. 130-2, Spoon Depo, p. 70:10–24.

> Q:           And was one of your goals when you came to Louisiana to help assist in either delaying or disrupting the construction of the Pipeline?
>
> Moll:        Yeah, I would say so.[197]

Spoon testified that members of their camp in kayaks "would go into the water and protest."[198] When asked to explain how they protested, she responded, "just being present, and using the Atchafalaya Basin."[199] Spoon was asked "How would they shut down construction of the Pipeline just by being present?", to which she responded, "Because those machines are not supposed to operate with people so close to them."[200] Spoon agreed that the protesters would get close enough to the machines that the operators had to shut down for safety reasons.[201]

On August 9, 2018, Plaintiffs continued to block the movement of the barge, despite repeated efforts to move them out of the way. Moll acknowledged that "by holding space in the public waterway, [he] was attempting to block the movement of the barge down the small canal":

> Yes. But I would say it was with the understanding that we actually could not block the barge, and it was really more about us being there, showing our presence, you know, showing that people were out, you know, opposing the project in one way or another. And to demonstrate that we do have a right to use the waterways. And everyone has a right to use public waterways.[202]

When asked what Moll meant in saying he could not block the barge, Moll agreed that this belief is because the barge "could have pushed [him] out of the way": "Yes, sir. I don't

---

[197] Rec. Doc. 130-3, Moll Depo, pp. 53:20–54:1.
[198] Rec. Doc. 130-2, Spoon Depo, p.154:18–19.
[199] *Id.* at p. 154:21–22.
[200] *Id.* at p. 155:3–6.
[201] *Id.* at p. 155:16–20.
[202] Rec. Doc. 130-3, Moll Depo, p. 201:11–22.

think there's any way to block a multi-ton barge with a plastic kayak."[203] Spoon was asked, "does it appear that you, or Ms. Cook-Phillips, or Mr. Moll are making any effort to move either his kayak or your canoe?" Spoon responded, "No, it looks like we're at a bit of a standoff."[204] Spoon also maintained the belief that they were not "blocking" the barge because:

> I just don't believe, and I've already said that I don't believe a canoe or a plastic kayak actually prevents a barge, or an air boat, or any other machine, or anything that they have in their hands to use. I don't think we're actually preventing anything like that from happening. I don't think a plastic kayak can block a barge.[205]

During her deposition, Cook-Phillips viewed the sequence of video evidence discussed above. She admitted that the fan boats were blowing Plaintiffs away from the smaller canal and away from the barge and that the photographs did not support her prior claim that the fan boats blew the Plaintiffs into the smaller channel.[206] She also acknowledged that the photographs depicted the Plaintiffs paddling toward the barge.[207] Cook-Phillips admitted that Plaintiffs' collective intention was to stay in the path of the barge: "I think I already said that we wanted to be out in the water. And since we were out there to see what was happening with construction, we were staying present next to the barge because it seemed related to construction."[208] Although Cook-Phillips testified that this conduct was not "a form of direct action where [they] put [their] bodies on the line to get in the way of construction," she also stated that "it seemed like" the workers were trying to move the barge, and that "seemed like" it might be construction activity.[209]

---

[203] *Id.* at pp. 201:23–02:3.
[204] Rec. Doc. 130-2, Spoon Depo, p. 204:6–10.
[205] *Id.* at p. 203:18–25.
[206] Rec. Doc. 130-1, Cook-Phillips Depo, pp. 167–77.
[207] *Id.*
[208] *Id.* at p. 178:2–7.
[209] *Id.* at pp. 178:16–79:3.

The P&P Defendants testified that Plaintiffs were given verbal commands to move for over five minutes, to no avail.[210] Plaintiffs dispute that they were given any verbal commands to move and correctly note that no such commands can be heard on the video recordings. However, Plaintiffs prevaricate on this point. Cook-Phillips testified as follows:

Q:    Do you remember anyone telling you not to be in the area?
A:    No, not specifically. I kind of feel, like, it's possible the construction workers who were up there was yelling at us. I couldn't hear very well. And also none of the parole officers – I don't remember any of them specifically saying that I wasn't supposed to be there.
Q:    Do you recall anyone telling you kind of more simply just to move out of the way?
A:    Definitely possible. It was really loud, but I think it's very possible they were yelling to move.
Q:    When you say "they," who do you mean?
A:    People on the fan boats.
Q:    When the people on the fan boats told you to move, do you recall trying to do that – try to move out of the way?
A:    No.
Q:    Why did you not move out of the way?
A:    I think I kind of came up earlier. I remember mentioning the fan boats were intimidating, the barge was intimidating, and I didn't feel like I really needed to move.[211]

Spoon testified that she did not recall being told to move out of the way, but she also testified: "I'm sure I was told to move out of the way. I feel I certainly was told that. By who, I don't remember."[212] Moll similarly testified that he did not remember anyone telling him to leave or get out of the way, but he also testified:

A:    I don't remember. Like I said, they were – from their body language, I could tell they were being very aggressive. But, like I said, it was incredibly loud and we couldn't hear what they were saying.
Q.    So even though you couldn't hear anyone if they were telling you to get out of the way, you could tell from their body language that they wanted you to move out of their way?
A:    Yeah, I would say so.[213]

---

[210] Rec. Doc. 130-11, Barbera Depo, pp.125–27.
[211] Rec. Doc. 130-1, Cook-Phillips Depo, pp. 232:19–33:21.
[212] Rec. Doc. 130-2, Spoon Depo, p. 273:7–12.
[213] Rec. Doc. 130-3, Moll Depo, p. 94:7–16.

Spoon testified that that she positioned her canoe in front of the barge because she believed she had every right to be there.[214] Cook-Phillips admitted that sitting in front of the barge was part of her protest.[215] She also admitted that she "paddled [her] canoe right up to" the barge.[216]

Based on the foregoing summary judgment evidence, the Court finds that there is no genuinely disputed material fact that probable cause was present to arrest Plaintiffs under La. R.S. 14:97. It matters not that this violation was not stated as the basis for Plaintiffs' arrests. In *Devenpeck v. Alford*, the Supreme Court held that, "[w]hile it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required."[217] In *Devenpeck*, police officers believed that a suspect had committed several offenses—including impersonating a police officer, lying to officers, and violating the State Privacy Act—but only arrested and charged him with an offense that was later found to be unsupported by the facts.[218] However, the Court dismissed the plaintiff's § 1983 claim for false arrest, finding that the warrantless arrest was valid as long as the officers had probable cause to arrest him for any crime based on the facts within their knowledge.[219] In *Arizmendi v. Gabbert*, the Fifth Circuit, relying on *Devenpeck*, held: "In warrantless arrests, there is no threat to a citizen's Fourth Amendment rights where the officer had probable cause to arrest, albeit not for the offense he chose to charge."[220] More recently,

---

[214] Rec. Doc. 130-2, Spoon Depo, p. 260, lines 1–7.
[215] Rec. Doc. 130-1, Cook-Phillips, pp.169–70.
[216] *Id.* at p. 192:22–24.
[217] 543 U.S. 146, 155 (2004).
[218] *Id.* at 149.
[219] *Id.* at 153–56.
[220] 919 F.3d 891, 903 (5th Cir. 2019), *cert denied*, 140 S.Ct. 220 (2019) (mem.).

the Supreme Court has opined: "Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking."[221]

Further, the undisputed evidence demonstrates that, while the P&P officers knew they were tasked with protecting BBP's right of way from trespassers, they were also tasked with preventing anyone from illegally obstructing the construction of the Pipeline. The email exchange on August 8, 2018, from Brandon Thompson to the P&P officers working the detail explained their orders:

> You have been very flexible and understanding when it comes to last minute change. You all adjusted extremely well. We appreciate that very much. At the beginning of this detail, we were told not to engage with the opposition. However, as the work increases and the opposition are getting aggressive, the "head guy" would like for us to do a little more. He would like us to be more proactive in moving the opposition **when they are obstructing work.** With that being said, **if the opposition is obstructing work**, please be verbal and attempt to have them moved. If they do not move, then contact the Sheriff's Office and work together in order to have them removed.[222]

Thus, it is uncontroverted that preventing violations of La. R.S. 14:97 was contemplated by the P&P officers in responding to the reports that Plaintiffs were in the right of way obstructing the barge's passage.

Plaintiffs' belief that they were not breaking the law and had every right to place themselves in the way of the barge is irrelevant to the determination of probable cause. In *Garcia v. Bloomberg*, the Second Circuit addressed a § 1983 action based on arrests made on the Brooklyn Bridge during an "Occupy Wall Street" protest.[223] The Court held that "the state of mind of the demonstrators—whether they thought that they were

---

[221] *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 584 n.2, 199 L.Ed.2d 453 (2018).
[222] Rec. Doc. 159-17, Depo Ex. 177, p. 1 (emphasis added).
[223] 662 F.App'x 50 (2d Cir. 2016), *cert denied* 137 S.Ct. 2266 (2017) (mem.).

participating in a sanctioned, First-Amendment-protected roadway march or whether they were intentionally or recklessly blocking traffic—is irrelevant to the question of probable cause, although it is a potential defense to the underlying criminal charge."[224]

Additionally, while Plaintiffs ostensibly dispute the P&P officers' P.O.S.T. certifications and arrest authority,[225] the Court finds that both the applicable law and uncontroverted evidence in this case demonstrate that the P&P officers who arrested Plaintiffs were P.O.S.T. certified and had authority to make arrests. First, La. R.S. 15:574.8 (A) provides:

> Parole officers shall be deemed to be peace officers and shall have the same powers with respect to criminal matters and the enforcement of the law relating thereto as sheriffs, constables, and police officers in their respective jurisdictions. They have all the immunities and matters of defense now available or hereafter made available to sheriffs, constables, and police officers in any suit brought against them in consequence of acts done in the course of their employment.

Further, P&P's expert witness, Kerry Najolia ("Najolia") opined that, at the time of Plaintiffs' arrests, the arresting P&P officers were P.O.S.T. certified, current in their P.O.S.T. training, and working approved security details.[226] Plaintiffs have offered no countervailing evidence to refute Najolia's conclusions on this issue.[227] The Court also

---

[224] *Id.* at 53 (citing *Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("[T]he arresting officer does not have to prove plaintiff's version wrong before arresting him.")).

[225] *See* Rec. Doc. 172-1, p. 3, Response to P&P statement of fact 7: "**Denied**. Neither of the cited sources state that all Louisiana Probation & Parole Officers are P.O.S.T. certified, nor do they address legal authority of off-duty Probation & Parole Officers to make arrests while working an off-duty security detail."

[226] Rec. Doc. 130-6, Najolia Report, pp. 6–7.

[227] Plaintiffs have filed a *Daubert* motion challenging Najolia's methodology and legal conclusions. Rec. Doc. 134. As to Najolia's opinions on P&P Defendants' POST certification and arrest authority, Plaintiffs claim these opinions are irrelevant because they have not asserted a failure to train claim against the P&P Defendants. To the extent that it can be inferred that Plaintiffs challenge the P&P officers' authority to make the arrests in question, the Court finds these opinions relevant. In *Day v. Baton Rouge City Police*, No. 17-328-EWD, 2020 WL 7024478, (M.D. La. Nov. 30, 2020), this Court addressed a *Daubert* challenge to the testimony and report of the police officer defendants' expert witness, Kerry Najolia, the same law enforcement expert being offered by the Defendants in the present case. *Day* involved § 1983 claims brought against police officers after they arrested protesters under La. R.S. 14:97 (simple obstruction of a

finds that Plaintiffs' testimony that there was no way to identify the P&P officers as law enforcement is directly controverted by the video evidence, as explained above. In *Malbrough v. City of Rayne*, the undersigned held that, while the Court evaluates the evidence in the light most favorable to the nonmovant, "any factual disputes raised by Plaintiff must be genuine."[228] Further, "[w]here a video recording, or conceivably some other unquestionable form of evidence, contradicts a plaintiff's recollection to such a degree that no reasonable juror could credit the plaintiff's testimony, the court must accept the facts as shown in the recording."[229]

Finally, the Court finds that the undisputed material facts demonstrate that the P&P officers came to their own conclusions that probable cause existed to arrest Plaintiffs. While the P&P officers were asked to report to the scene by the construction workers based on the allegations by the workers that Plaintiffs were trespassing on BBP's right-of-way, several officers testified under oath that their own observations of Plaintiffs' conduct formed the basis for probable cause. Adams was asked, "if you didn't think that anyone should be arrested, if none of the plaintiffs had broken any laws, would you still

---

highway of commerce). In *Day*, the Court excluded Najolia's conclusions that the officers had probable cause to make the arrests, that they used the appropriate amount of force in making the arrests, and that the officers acted reasonably throughout the arrests, finding that these issues were for the jury to resolve. *Id.* at *5–*6. However, the Court allowed Najolia to provide testimony "regarding other relevant issues that will assist the jury," like "his opinions on POST training requirements, including whether certain officers were current in their training" based on Najolia's "experience and training" in these areas. *Id.* at *7. Without issuing a formal ruling on the pending *Daubert* challenge (Rec. Doc. 134) to Najolia's report and conclusions in this case, the Court finds, based on the same reasoning and analysis set forth in *Day* when confronting similar facts, that Najolia's conclusions regarding POST training/certification and the authority of the P&P officers to make arrests are reliable under *Daubert* and admissible summary judgment evidence in this case.

[228] No. 10-107-SDD-CBW, 2019 WL 1120064, at *7 (W.D. La. Mar. 11, 2019) (citing *J & J Sports Prod., Inc. v. Mandell Fam. Ventures, L.L.C.*, 751 F.3d 346, 347–48, 2014 WL 1757307, at *1 (5th Cir. May 2, 2014)), *aff'd*, 814 Fed.App'x 798 (5th Cir. 2020).

[229] *Id.* (citing *Scott v. Harris*, 550 U.S. 372, 378–79 (2007)) (the court held: "Based on the photographic evidence submitted and stipulated to by all Parties in this matter, the Court finds that the photographs of the officers in the Police Report establish unquestionably that the defendants were dressed in a manner by which it was reasonable for them to conclude Campbell knew or should have known they were police officers at the time he was ordered to exit the vehicle.")

participate in making the arrests?" Adams responded, "Definitely not."[230] She was also asked if HUB had told her to arrest someone, and she did not think "that an arrest was proper warranted," would she still make the arrest, to which Adams responded, "No."[231] She further denied that HUB had the control to force her to arrest someone.[232] Matherne testified:

> I'm not saying they were arrested because the guy—you know, it was the situation was—had he allowed them to go and not requested that they be arrested then that would have been fine. But beings he filed the complaint and that's what the direction he wanted to go the other agents detained them. The discussion was made. And then, according to what had happened then the arrest was justified . . . If the arrest wasn't proper, no I wouldn't have completed it.[233]

Black testified to what he observed when he arrived on the scene:

> When we arrived at the centralized construction site, I think, they had—they had gotten privy to the time that the construction crews, kind of, assembled and went and started to go about their various tasks. And right as the crews, kind of, broke into smaller crews, they emerged from the—from the woods or from the inner parts of the Bayou. I think, the gentleman was in a kayak and the ladies were in the canoe. As the airboats were trying to load the various crews and—and equipment, they began to paddle their way into the—the areas in which the air boats were trying to move and—and they were moving in such a way that made it dangerous for both themselves and the—the airboat operators, you know. If you can imagine, you know, a boat with a huge fan on the back and a person in close proximity just paddling back and forth in circular and figure eight motions, you know, seemingly to obstruct the path of the air boots [sic] So he did that for several minutes and made for several hazardous interactions between themselves and the airboats. It was communicated to them verbally that they were, you know, both in harm's way and causing a hazardous environment for the operation of the air boats and the construction crews. So they were told verbally, you know, to yield the right-of-way to the airboats to, you know, basically, give them room to operate safely. Several times this was done. They refused, making comments of their own and—in opposition, in defiance.[234]

---

[230] Rec. Doc. 130-8, Adams Depo, p. 95:4–7.
[231] *Id.* at 95:8–14.
[232] *Id.* at 95:15–20.
[233] Rec. Doc. 131-1, Matherne Depo, p. 149:14–50:8.
[234] Rec. Doc. 130-9, Black Depo, pp. 97:13–98:23.

The video evidence confirms that the P&P officers did not merely report to the scene and immediately arrest Plaintiffs at the direction of the construction workers. Rather, the P&P officers reported to the scene, attempted to move Plaintiffs out of the way of the barge with their fan boats, and only arrested Plaintiffs after Plaintiffs repeatedly and intentionally repositioned themselves back in front of the barge to purposely obstruct its path.

Accordingly, the Court finds that all Defendants are entitled to summary judgment on Count I, the claim of False Detention, Arrest, and Imprisonment in Violation of the Fourth and Fourteenth Amendments because actual probable cause existed to arrest Plaintiffs. The Defendants are likewise entitled to summary judgment on the corresponding state law constitutional and tort claims based on the alleged false detention, arrest, and imprisonment asserted in Count VII.[235],[236] Further, Plaintiffs' failure to intervene (bystander) and municipal liability claims fail due to the lack of an underlying

---

[235] *Sanders v. CEOC L.L.C.*, 586 F.Supp.3d 519, 527 (W.D. La. 2022) ("Louisiana applies the same standards to analyze claims of false arrest, excessive force, and negligent training or supervision as the standards utilized under federal law. *Colston v. Barnhart*, 130 F.3d 96, 99 (5th Cir. 1997), *rehearing denied* 146 F.3d 282, *cert. denied*, 525 U.S. 1054, 119 S.Ct. 618, 142 L.Ed.2d 557 (1998). Additionally, Louisiana applies qualified immunity principles to state constitutional law claims based on the same factors that compelled the Supreme Court of the United States to recognize a qualified good faith immunity for state officers under § 1983. *Moresi v. State*, 567 So.2d 1081, 1093 (La. 1990).") Plaintiffs acknowledge that the federal and state claims are essentially the same: "P&P Defendants' arguments for summary judgment on Plaintiffs' state-law claims for false and retaliatory arrest mirror their arguments for these claims' federal counterparts. As such, Plaintiffs incorporate here their arguments on those federal claims in the preceding sections of this brief . . ." Rec. Doc. 172, p. 28.

[236] Plaintiffs admit they have not asserted a Fourth Amendment claim for excessive force. Rec. Doc. 140, p. 15. In Louisiana, "If the arrest is unlawful then all force used to effectuate the arrest is excessive and constitutes a battery." *LaBauve v. State*, 618 So.2d 1187, 1193 (La. Ct. App. 3d Cir. 1993); *see also Ross v. Sheriff of Lafourche Parish*, 479 So.2d 506, 510 (La. Ct. App. 1st Cir. 1985) ("The jurisprudence . . . establishes that the physical attack of a private citizen by a police officer absent a valid arrest constitutes a battery."). The basis for Plaintiffs' state law claims for assault and battery is Plaintiffs' belief that their arrests were unlawful. As the Court has held their arrests lawful, Plaintiffs' state law assault and battery claims fail, particularly where there is no claim for excessive force.

constitutional violation.[237] Summary judgment is granted in favor of the SMPSO Defendants on Counts II and IV.[238]

## 2. Qualified Immunity for Arguable Probable Cause

Alternatively, the Court finds that the P&P Defendants are entitled to qualified immunity because it was objectively reasonable, based on the facts known to them at the time, that they had probable cause to arrest Plaintiffs under La. R.S. 14:61, La. R.S. 14:96, and La. R.S. 14:97. The Fifth Circuit has held that, "'[e]ven law enforcement officials who reasonably but mistakenly conclude that probable cause is present are entitled to immunity.'"[239] Law enforcement officers may rely on the "collective knowledge of the officers" at the scene to determine that probable cause exists for an arrest.[240]

The Second Circuit has opined: "Even where a reviewing court, applying these principles, concludes that probable cause to arrest was lacking in a given case, an officer 'will still be entitled to qualified immunity . . . if he can establish that there was "arguable probable cause" to arrest.'"[241] "'Arguable probable cause exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers

---

[237] *See Buehler v. Dear*, 27 F.4th 969, 977 (5th Cir. 2022) ("We also conclude that summary judgment for the officers on Buehler's false-arrest claim was proper; the officers were entitled to qualified immunity on Buehler's First Amendment claim; and Buehler's bystander and municipal-liability claims fail for lack of an underlying constitutional violation."); *see also Sanders*, 586 F.Supp.3d at 527("First, as this Court finds no constitutional violation by Anderson, then there can be no liability against Shreveport. *Windham v. Harris City., Tex.*, 875 F.3d 229, 243 (5th Cir. 2017).").

[238] Because the Court finds that there was probable cause for Plaintiffs' initial arrests, the Court does not address the charges of resisting an officer or interference with an investigation.

[239] *Westfall v. Luna*, 903 F.3d 534, 543 (5th Cir. 2018) (quoting *Mendenhall v. Riser*, 213 F.3d 226, 230 (5th Cir. 2000)).

[240] *U.S. v. Kye Soo Lee*, 962 F.2d 430, 435 (5th Cir. 1992).

[241] *Zalaski v. City of Hartford*, 723 F.3d 382, 389–90 (2d Cir. 2013) (quoting *Escalera v. Lunn*, 361 F.3d 737, 743 (2d Cir. 2004)).

of reasonable competence could disagree on whether the probable cause test was met.'"[242]

First, Plaintiffs' waiver argument regarding the defense of probable cause under La. R.S. 14:96 and/or 14:97 is meritless. Plaintiffs' reliance on the Fifth Circuit's decision in *Pasco ex rel. Pasco v. Knoblauch*[243] is misplaced. Further, Plaintiffs' statement that the *Pasco* court held that "the alternative probable cause defense must be raised as an affirmative defense,"[244] is disingenuous at best. The words "alternative probable cause" do not appear in the *Pasco* decision. Ultimately, the *Pasco* court held that the defendant did not waive the defense of qualified immunity by raising it for the first time in a summary judgment motion, where time remained for the plaintiff to investigate the defense.[245]

The record in this case also undermines Plaintiffs' claim that they were not aware of this defense until the filing of Defendants' summary judgment motions, and they have therefore been left no time to investigate or respond to such a defense. P&P Defendants clearly raised qualified immunity as a defense in their *Answer*.[246] Also, in January 2021, the Parties filed two Joint Status Reports, both of which contain specific references to the defense of probable cause for obstructing a navigable waterway.[247] The SMPSO Defendants raised the issue: "[w]hether there was probable cause to believe that Plaintiffs violated R.S. 14:97 at the time of their arrests."[248] Fact discovery closed on January 31,

---

[242] *Id.* (quoting *Escalera*, 361 F.3d at 743) (internal quotation marks omitted); *accord Walczyk v. Rio*, 496 F.3d, 139, 163(2nd Cir. 2007).
[243] 566 F.3d 572, 577 (5th Cir. 2009).
[244] Rec. Doc. 172, p. 18, n. 89: "*Pasco ex rel. Pasco v. Knoblauch*, 566 F.3d 572, 577 (5th Cir. 2009) (holding that the alternative probable cause defense must be raised as an affirmative defense)."
[245] *Pasco*, 566 F.3d at 577–78.
[246] Rec. Doc. 47, p. 20.
[247] Rec .Doc. 54, p. 11; Rec. Doc. 59, p. 11.
[248] *Id.*

2022.[249] Plaintiffs had notice of this defense for a year and had ample time to investigate. The defense is properly before the Court.

Second, it is undisputed that the State of Louisiana granted a Pipeline Right-of-Way Grant to BBP.[250] Plaintiffs' geological expert, G. Paul Kemp, Ph.D., drafted a report wherein he concluded that the Right-of-Way granted to BBP by the State did not confer any private property rights on BBP; rather it included the following language "to protect the public interest:"

> The granting of this right-of-way shall not be a bar or defense to the right of the State of Louisiana and its agencies, boards and commissions to take any and all action necessary to seek abatement of construction or operations that unreasonably or unlawfully interfere with or disturb the existing ecological regimen, including but not limited to the fishing, hunting, trapping and oyster industries, and to take action for any and all damage to the existing ecological regimen which does not result from a reasonable exercise of the rights herein granted.[251]

There is no evidence in this case to suggest that Plaintiffs herein are "the State of Louisiana and its agencies, boards and commissions," nor is there evidence to support that Plaintiffs were engaged in "fishing, hunting, trapping, or [the] oyster industr[y]." The facts known to the officers at the time—that Plaintiffs were blocking the movement of the barge, failed to respond to their verbal commands to move, and appeared to be interfering with BBP's right-of-way—demonstrate that it was objectively reasonable for the officers to believe they had probable cause to arrest Plaintiffs pursuant to La. R.S. 14:61 by "[r]emaining upon or in the premises of a critical infrastructure after having been forbidden to do so." Indeed, Spoon admitted in her deposition that she "now" understands that BBP had a right-of-way to move the barge through the waterway.

---

[249] Rec. Doc. 71.
[250] Rec. Doc. 158-18, Kemp Report, pp. 11–15.
[251] *Id.* at p. 14.

Q.      And did you believe you didn't have to get out of the way of that barge because you had every right to be there? Is that fair?

A.      Yeah, I guess, yeah.

Q.      Now, ultimately, based on your recollection, you knew, or you know today, that the barge moved from one side of the bayou into the canal to the Bayou Bridge right-of-way for purposes of performing some activities involved in the construction, correct?

A:      I know that now, yes. [252]

The Court finds that it was likewise objectively reasonable for the officers to believe they had probable cause to arrest Plaintiffs under La. R.S. 14:96 and/or 14:97 based on the record evidence discussed above. Plaintiffs admitted they were attempting to obstruct the movement of the barge through the waterway, and the video evidence establishes this fact; thus, there was arguable probable cause to arrest Plaintiffs for simple obstruction.

Aggravated obstruction prohibits conduct if it is foreseeable that human life might be endangered. Several P&P Defendants testified about the dangers created by Plaintiffs' conduct. As quoted above, Black testified that "[i]t was communicated to them verbally that they were, you know, both in harm's way and causing a hazardous environment for the operation of the air boats and the construction crews. So they were told verbally, you know, to yield the right-of-way to the airboats to, you know, basically, give them room to operate safely."[253] Ward testified that Moll positioned his kayak in front of the barge in a manner that "it would've had to run over [Moll] to get where it was trying to get to."[254] Spoon testified that camp members would use kayaks and canoes to protest by getting

---

[252] Rec. Doc. 130-2, Spoon Depo, p. 258:1–14.
[253] Rec. Doc. 130-9, Black Depo, pp. 97:13–98:23.
[254] Rec. Doc. 132-20, Ward Depo, pp. 87:22–24, Exhibit 5, p. 2.

too close to construction equipment, which created safety hazards and required the machines to be shut down."[255]

Plaintiffs argue that "it is not reasonably foreseeable that paddling a canoe or a kayak in a large Pipeline canal would endanger human life."[256] Plaintiffs do not cite to any authority or evidence to support this conclusion.[257] Arguments by counsel in a brief do not constitute summary judgment evidence.[258] The testimony by Defendants regarding the dangerous situation created by Plaintiffs' conduct is uncontroverted. Thus, the Court finds that the P&P Defendants were objectively reasonable in believing they had probable cause to arrest Plaintiffs under La. R.S. 14:96.

The Defendants rely on the decision by another section of this Court in *Tennart v. City of Baton Rouge*.[259] There, the plaintiff brought § 1983 claims for false detention, arrest, and imprisonment, failure to intervene, First Amendment retaliation, the equivalent state law constitutional claims and torts, and IIED. The police officers moved for summary judgment, arguing they had probable cause to arrest the plaintiff for obstructing a highway in violation of La. R.S. 14:97. The Court granted summary judgment in favor of the police officers, finding that, "even construing the evidence in a light most favorable to [the plaintiff] and drawing reasonable inferences in his favor, the Court finds that all reasonable jurors would conclude that [the officer] observed [the plaintiff] obstructing

---

[255] Rec. Doc. 130-2, Spoon Depo, pp. 156–57.

[256] Rec. Doc. 172, p. 19.

[257] Plaintiffs reference weighing credibility of testimony and the video footage but do not direct the Court to specific summary judgment evidence to negate Defendants' testimony that Plaintiffs' conduct created dangerous condition for all persons present on the water that day.

[258] *See Badon v. Dolgencorp*, No. 21-CV-01525, 2022 WL 7734636, at *3 (W.D. La. Oct. 12, 2022) (citing *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007)) ("Unsupported arguments and representations of counsel in a brief are not competent summary judgment evidence.").

[259] No. CV 17-179-JWD-EWD, 2022 WL 4099156, at *2 (M.D. La. Sept. 7, 2022). *Tennart* is one of several cases before Judge deGravelles arising out of protests occurring in Baton Rouge following Alton Sterling's death.

Airline Highway—an extremely busy U.S. Highway—and that [the officer] thus had probable cause to arrest [the plaintiff] for violating La. R.S. 14:97, simple obstruction of a highway.[260] The Court based its ruling on "evidence showing or reflecting that [the plaintiff] was intentionally in the roadway at the time of the arrest" which included: "(1) the videos of the arrest . . . ; (2) pictures in evidence . . . (3) some of the undisputed facts, as admitted or qualified . . . ; and (4) [the officer's] testimony."[261] While the Court held that there was actual probable cause to arrest the plaintiff, it further stated: "At the very least, [the officer] is entitled to qualified immunity on this claim, as the Court cannot say that every reasonable officer in [the officer's] shoes would know that participating in [the plaintiff's] arrest under these circumstances was a violation of clearly established law."[262] The reasoning and analysis in *Tennart* is equally appliable in the present case based on the evidence discussed above.[263]

### C.    § 1983 Civil Conspiracy

Though not listed as a distinct count in their *Amended Complaint*, Plaintiffs have alleged facts and presented evidence that they argue supports a claim that all Defendants entered into a civil conspiracy under § 1983 whereby they agreed to violate Plaintiffs' constitutional rights. The Fifth Circuit holds that, "[t]o support a conspiracy claim under § 1983, the plaintiff must allege facts [and ultimately prove] that suggest 'an agreement between the . . . defendants to commit an illegal act' and 'an actual deprivation of

---

[260] *Id.*

[261] *Id.* at 2.

[262] *Id.* (citing *Doe v. McKesson*, 2021-00929 (La. 3/25/22), 339 So. 3d 524, 533 (stating, in answering questions certified by the U.S. Fifth Circuit arising from the protest on Airline Highway, that "the blocking of a heavily traveled highway, thereby posing a hazard to public safety," was "the commission of a crime").

[263] Plaintiffs rely on *Cox v. State of La.*, 379 U.S. 559, *reh'g denied*, 380 U.S. 926 (1965), a protester case decided by the Supreme Court in 1965. However, as P&P Defendants note, *Cox* was decided before numerous courts have held that blocking a navigable highway under La. R.S. 14:97 is a violation of law.

constitutional rights.'"[264] "'A conspiracy claim is not actionable without an actual violation of section 1983.'"[265] Because the Court has held that probable cause existed for Plaintiffs' arrests, Plaintiffs' civil conspiracy fails because they suffered no actual constitutional violation.[266]

Alternatively, as the Court held in *Imani v. City of Baton Rouge*, "'[t]he First Amendment does not entitle a citizen to obstruct traffic or create hazards for others. A State may therefore enforce its traffic obstruction laws without violating the First Amendment, even when the suspect is blocking traffic as an act of political protest.'"[267] This principle is equally applicable to a navigable waterway.

### D. First Amendment Retaliation

The First Amendment prohibits government officials from taking retaliatory actions against individuals for engaging in protected speech.[268] To prevail on a First Amendment retaliation claim, Plaintiffs must establish that: "(1) [they] engaged in constitutionally protected activity, (2) the defendants' actions caused [them] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [the plaintiff's] exercise

---

[264] *Terwilliger v. Reyna*, 4 F.4th 270, 285 (5th Cir. 2021) (quoting *Cinel v. Connick*, 15 F.3d 1338, 1343 (5th Cir. 1994)).

[265] *Hale v. Townley*, 45 F.3d 914, 920 (5th Cir.) (quoting Pfannstiel v. City of Marion, 918 F.2d 1178, 1183 (5th Cir. 1990)), *reh'g denied*, 51 F.3d 1047 (1995).

[266] *See Weg v. Gusman*, Civ. No. 10-4198, 2011 WL 4965391, at *7 (E.D. La. Oct. 9, 2011) ("Because the Court has already found that Deputy Gray had probable cause to arrest Weg, Weg's claim for initiating a prosecution with false testimony fails. Weg's claim for civil conspiracy fails for the same reason.") (citing *McCall v. Peters*, 108 Fed. Appx. 862, 863 (5th Cir.2004) (civil conspiracy claim fails because plaintiff did not show "an actual violation of his rights or an agreement by the defendants to commit an illegal act") (citations omitted)); *see also Haith v. City of Shreveport*, No. 03-2128, 2005 WL 2140583, at *4 (W.D. La. Sep. 1, 2005) (Court held that Haith's arrest was not unlawful because the court had determined that probable cause existed.).

[267] 614 F.Supp.3d 306, 356 (M.D. La. 2022) (quoting *Singleton v. Darby*, 609 F.App'x 190, 193 (5th Cir. 2015) (per curiam) (citation omitted)).

[268] *Nieves v. Bartlett*, —— U.S. ——, 139 S. Ct. 1715, 1722, 204 L.Ed.2d 1 (2019) (citing *Hartman v. Moore*, 547 U.S. 250, 256, 126 S.Ct. 1695, 164 L.Ed.2d. 441 (2006)).

Page **51** of 57

of constitutionally protected conduct."[269] Generally, "the validity of a plaintiff's First Amendment claim hinges on probable cause for [the] arrest."[270]

However, in *Imani*, the Court noted the Supreme Court's admonition that:

"[a]lthough probable cause should generally defeat a retaliatory arrest claim, a narrow qualification is warranted for circumstances where officers have probable cause to make arrests, but typically exercise their discretion not to do so."[271] "In such cases, an unyielding requirement to show the absence of probable cause could pose a risk that some police officers may exploit the arrest power as a means of suppressing speech."[272]

. . .

Thus, "the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been."[273] "After making the required showing, the plaintiff's claim may proceed in the same manner as claims where the plaintiff has met the threshold showing of the absence of probable cause."[274]

The Court has held that probable cause existed in this case, and Plaintiffs have not presented the Court with objective summary judgment evidence demonstrating that they were arrested, but similarly situated individuals engaging in the same conduct as Plaintiffs have not been arrested. In fact, the case of *Hat v. Landry* in the Western District of Louisiana establishes that other similarly situated Bayou Bridge Pipeline protesters have been arrested under La. R.S. 14:61.[275] Accordingly, Defendants are entitled to summary judgment on Plaintiffs' First Amendment retaliation claim (Count III) and the corresponding State Law Constitutional claim (Count V).

---

[269] *Westfall v. Luna*, 903 F.3d 534, 550 (5th Cir. 2018) (per curiam) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002)).
[270] *Id.*
[271] *Imani*, 614 F.Supp.3d at 357 (quoting *Nieves*, 139 S.Ct at 1727).
[272] *Id.* (quoting *Nieves*, 139 S.Ct at 1727).
[273] *Id.* (quoting *Nieves*, 139 S.Ct at 1727) (citation omitted)).
[274] *Id.* (quoting *Nieves*, 139 S.Ct at 1727).
[275] *Hat v. Landry*, No. 6:20-CV-00983, 2021 WL 1823089 (W.D. La. May 5, 2021).

**E. IIED**

To establish a cause of action for intentional infliction of emotional distress under Louisiana law, a plaintiff must prove the following three elements: "(1) that the conduct of defendant was extreme and outrageous; (2) that the emotional distress suffered by the plaintiff was severe; and (3) that the defendant desired to inflict severe emotional distress or knew that severe emotional distress would be certain or substantially certain to result from his conduct."[276] "The conduct must be intended or calculated to cause severe emotional distress and not just some lesser degree of fright, humiliation, embarrassment, worry, or the like."[277] Conduct which is merely tortious or illegal does not rise to the level of being extreme and outrageous for purposes of this cause of action.[278] "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."[279]

Defendants move for summary judgment on this claim based on the testimony of Plaintiffs. Spoon testified that she has not sought any treatment for any psychological, emotional issues relating to the arrest.[280] Moll likewise testified that he sought no treatment for his emotional or psychological injuries stemming from his arrest.[281] Cook-Phillips sought no treatment for mental distress until nearly two years after the arrest. She was diagnosed with depression but has no opinion from any doctor as to the cause of the

---

[276] *White v. Monsanto Co.*, 585 So.2d 1205, 1209 (La. 1991).
[277] *Id.* at 1210 (citing Restatement (Second) of Torts § 46 (1965)); *see also Almerico v. Dale*, 927 So.2d 586, 592–93 (La. Ct. App. 5th Cir. 2006) (An employer's conduct must be "intended or calculated to cause severe emotional distress, not just some lesser degree of fright, humiliation, embarrassment, or worry.").
[278] *Schmidt v. Cal-Dive Int'l*, 240 F. Supp. 3d 532 (W.D. La. 2017); *see also White*, 585 So.2d at 1210.
[279] *White*, 585 So.2d at 1209.
[280] Rec. Doc. 130-2, Spoon Depo, p. 251:18–23.
[281] Rec. Doc. 130-3, Moll Depo, p. 114:10–15.

depression or connecting the depression to her arrest.[282] Cook-Phillips testified that she received treatment from therapists prior to the arrest, and she had trouble sleeping prior to the arrest.[283] Defendants contend Plaintiffs' descriptions of their alleged emotional distress does not meet the high burden of proof to establish an IIED claim.

In opposition, Plaintiffs quote *White*: "the extreme and outrageous character of the conduct may arise from an abuse by the actor of a position, or a relation with the other, which gives him actual or apparent authority over the other, or power to affect his interests."[284] Plaintiffs argue that such an abuse of power happened here because Defendants lacked probable cause to arrests Plaintiffs. Plaintiffs cite cases wherein Louisiana courts have held defendants liable for severe emotional distress they should have known would occur based on their actions.[285]

Plaintiffs claim Spoon and Cook-Phillips were "pushed into a canal by airboats and then ripped from their canoe, while Moll was tackled in the water."[286] Thus, they claim the Defendants should have known that arresting Plaintiffs in this manner without probable cause would cause them severe emotional distress. Cook-Phillips testified that "[i]t was really scary and for weeks after, [she] was having a hard time sleeping."[287] After graduating from college, she felt "scared to participate in the world," and now has a "sense

---

[282] Rec. Doc. 130-1, Cook-Phillips Depo, pp. 91:4–12, 98.

[283] *Id.* at pp. 87:17–90:25.

[284] Rec. Doc. 172, pp. 28–29 (quoting *White*, 585 So.2d at 1209–10).

[285] *Id.* at p. 29. (Plaintiffs cite *Taylor v. State*, No. 92-230 (La. App. 3d Cir. 3/31/93) 617 So. 2d 1198, 1204 (officer "indicated reckless indifference to the likelihood of his actions causing the plaintiff emotional distress" where he initiated an investigation into plaintiff's prescription pill purchases in order to discredit her); Smith v. Mahfouz, 489 So. 2d 409 (La. Ct. App. 3d Cir.), *writ denied*, 494 So. 2d 1181 (La. 1986) (plaintiff was entitled to damages for anxiety where a defendant had felled trees blocking plaintiff's access to the roadway such that the defendant must have realized that the plaintiff would suffer anxiety from the idea there could be a fire in his buildings)).

[286] *Id.*

[287] Rec. Doc. 158-5, Cook-Phillips Depo, p. 84:3–6.

of hopelessness about the world."[288] Moll testified that, following the arrest, he experienced "an hour feeling that extreme sense of unsafety and like my life was in the hands of these people who you had no right to be in that position."[289] He experiences anxiety at that thought of being on watercraft or being restrained.[290] He testified that "going to jail was also a traumatic experience" and "there were not enough beds in the jail."[291] Plaintiffs present no evidence as to Spoon's alleged severe emotional distress.

The Court finds that Plaintiffs have failed to present a fact issue for the jury for their IIED claim. The Court has found that the Plaintiffs' arrests were lawful; thus, there was no abuse of power. Having made lawful arrests with either actual or arguable probable cause, there is no legal or evidentiary basis in the current record to support that the Defendants intended, knew, or should have known that severe emotional distress would result from their arrests of Plaintiffs.

The cases Plaintiffs argue support their IIED claim are easily distinguished. In *Taylor v. State*, the court noted that to find liability, "the defendant must have desired the result or realized to a virtual certainty that the result would occur."[292] The facts of *Taylor* involve conduct by a narcotics detective far more outrageous and egregious than any present in this case. In *Taylor*, the court upheld an IIED claim involving a police officer who allegedly commenced a criminal investigation which led to the arrest of a citizen who had filed a suit against the officer.[293] The court concluded that the officer did not conduct the investigation based upon reasonable suspicion, but for the purpose of discrediting the

---

[288] *Id*. at p. 84:3–23.
[289] Rec. Doc. 130-3, pp. 114:18–16:10.
[290] *Id*.
[291] *Id*.
[292] 617 So.2d 1198, 1204 (La. Ct. App. 3d Cir. 1993) (citing *Smith v. Mahfouz*, 489 So.2d 409 (La. Ct. App. 3d Cir.), *writ denied*, 494 So.2d 1181 (La. 1986)), *writ denied*, 620 So.2d 875 (La. 1993).
[293] *Id*. at 1200–02.

plaintiff in her lawsuit.[294] The facts of *Smith v. Mahfouz* likewise bear little resemblance to the facts of this case. In *Smith*, the court held that the plaintiff was entitled to damages for anxiety where the defendant had felled trees blocking plaintiff's access to the roadway such that the defendant must have realized that the plaintiff would suffer anxiety from the idea there could be a fire in his buildings.[295]

The facts of this case are more analogous to those presented in *Imani*. The Court granted summary judgment in favor of the defendant police officers on a plaintiff's claim of IIED where the plaintiff claimed that the alleged false arrest caused her emotional distress manifested by "'depression, loss of appetite, weight loss, and social isolation,' as well as an effect on her willingness to participate in future protests or demonstrations."[296] The Court held: "Even considering the evidence in a light most favorable to Plaintiff, the Court cannot say that '[t]he distress suffered [is] such that no reasonable person could be expected to endure it' or that 'the mental suffering or anguish is extreme.'"[297]

In *Thomas v. Town of Jonesville*, the plaintiff asserted claims of false arrest and IIED.[298]  The court found that the officer's conduct during the investigatory stop and subsequent arrest was lawful and that the officer employed force within the bounds of reasonableness.[299] The court granted summary judgment on the plaintiff's IIED claim: "This conduct cannot, therefore, as a matter of law, constitute 'extreme and outrageous' behavior such as would be required for plaintiff's IIED claim."[300] Accordingly, Defendants are entitled to summary judgment on Plaintiffs' IIED claims.

---

[294] *Id*. at 1204.
[295] 489 So. 2d 409 (La. Ct. App. 3d Cir.), *writ denied*, 494 So. 2d 1181 (La. 1986).
[296] *Imani v. City of Baton Rouge*, 614 F.Supp.3d 306, 379 (M.D. La. 2022).
[297] *Id*. (quoting *White*, 585 So. 2d at 1210 (citations omitted)).
[298] Civ. No. 11-408, 2013 WL 265235, *1 (W.D. La. Jan. 23, 2013).
[299] *Id*. at *8.
[300] *Id*.

## III.    CONCLUSION

For the foregoing reasons, the *Motions for Summary Judgment* filed by the SMPSO Defendants,[301] HUB Enterprises,[302] and the P&P Defendants[303] are GRANTED. *Judgment* shall be entered accordingly.

**IT IS SO ORDERED.**

Signed in Baton Rouge, Louisiana on <u>July 17, 2023</u>.


_____
**SHELLY D. DICK**
**CHIEF DISTRICT JUDGE**
**MIDDLE DISTRICT OF LOUISIANA**

---

[301] Rec. Doc. 89.
[302] Rec. Doc. 101.
[303] Rec. Doc. 129.